**INTERMEAT, INC., Plaintiff-Appellee,**

v.

**AMERICAN POULTRY INCORPORATED and A & W Foods, Defendants-Appellants.**

**Nos. 709, 710, Dockets 77–7481, 77–7495.**

United States Court of Appeals, Second Circuit.

Argued Feb. 16, 1978.

Decided April 14, 1978.

---

Joseph L. Newman, Cleveland, Ohio (Newman & Newman, Cleveland, Ohio, and Francis J. Murphy, Hopgood, Calimefde, Kalil, Blaustein & Lieberman, New York City, of counsel), for defendants-appellants.

Robert Shenkman, New York City (Kommel, Rogers, Kaufman, Lorber & Shenkman, New York City, of counsel), for plaintiff-appellee.

Before LUMBARD, TIMBERS and GURFEIN, Circuit Judges.

GURFEIN, Circuit Judge:

This appeal requires us to consider for the first time the effect of the constitutional rule announced in *Shaffer v. Heitner,* 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), on the New York law authorizing *quasi-in-rem* jurisdiction over a nonresident defendant based on the attachment of a debt due to the defendant from a debtor found in New York. N.Y. C.P.L.R. §§ 6202, 5201, 314, 315.

Intermeat, Inc., a New York corporation with its office in Great Neck, New York, brought a suit in New York Supreme Court to recover damages from American Poultry Incorporated, an Ohio corporation, for wrongful rejection of a shipment of meat. After the action was removed to the United States District Court for the Eastern District of New York, the District Court (Hon. Jack B. Weinstein, Judge) held in a pre-trial order that it lacked *in personam* jurisdiction over American Poultry Incorporated ("American Poultry"). The District Court stayed its order of dismissal, however, pending disposition of a motion by Intermeat, Inc. ("Intermeat") to attach a debt in an amount exceeding the claim in suit, owed to American Poultry by the Great Atlantic & Pacific Tea Co. ("A&P"), a corporation doing business in New York. After entering an order of attachment, the District Court sitting without a jury heard the evidence and entered a judgment for Intermeat in the amount of $19,800.99 (the difference between the contract price and the amount remitted by the defendant) plus interest at the statutory rate of 6%, basing *quasi-in-rem* jurisdiction on the attachment. The court held that there were sufficient "minimum contacts" with New York to satisfy *Shaffer v. Heitner, supra.* American Poultry, relying principally on *Shaffer v. Heitner, supra,* contends that the District

Court's assertion of jurisdiction based on the attachment of the debt was unconstitutional. It also argues that even if the District Court had jurisdiction, it should have held that the rejection of the meat by the defendant was proper. Intermeat contends that it should have been awarded its actual bank financing charges rather than interest at the statutory rate.

American Poultry has no office in New York, nor has it consented to service of process on it through the Secretary of State. Intermeat and American Poultry did, however, enter into at least five contracts for the sale of imported meat to American Poultry before January 1974. In each case, Intermeat sent to American Poultry from its office in New York a contract describing the goods sold, the price, and the delivery terms; in some instances American Poultry signed and returned a copy of the contract to the Great Neck office, while in others it apparently retained both copies without objection to the terms. Some of the contracts called for delivery to American Poultry in Cleveland, while others specified Port Newark[1] and Philadelphia. Each of the contracts, prepared on Intermeat's form contract showing its New York address, contained an arbitration clause providing for arbitration in New York in the following terms:

> "Any dispute or controversy arising in or out of this contract shall be submitted to the American Arbitration Association, New York, N.Y., for arbitration in accordance with its rules and the parties hereto agree to be bound by its determination."

The District Court also found that the defendant American Poultry sells large quantities of meat to persons doing substantial business in New York, including A&P. Indeed, there was evidence that the volume of defendant's business with New York companies amounted to as much as seven million dollars a year, and that 25 to 30% of the defendant's imported meat business is with New York importers. Payments for meat purchased in this manner are made by check mailed to New York.

With this background we turn to the contract in suit. In January 1974 Intermeat and American Poultry, through the mediation of a Philadelphia broker, entered into the contract in suit, for the purchase of two loads (30 long tons) of meat by American Poultry. Intermeat sent to American Poultry one of its form contracts describing the meat as "Australian 3rd mfg. cow crops and hinds, Richardson Production," setting a price of $0.95/lb. ex-dock Philadelphia, and calling for shipment from Australia in January or early February. The standard arbitration clause appeared at the foot of the contract. As it had done in several previous transactions with Intermeat, American Poultry did not sign and return a copy of the contract to Intermeat but simply retained both copies of the contract without making any objection to its terms.

American Poultry took delivery of the meat when it arrived in Philadelphia in March 1974 and had it transported to its Cleveland plant. American Poultry notified Intermeat shortly thereafter that it was rejecting the delivery because the cartons containing the meats were marked "Tasmeats" rather than "Richardson Production." In June 1974 American Poultry sold the meat and remitted to Intermeat $44,039.01, a sum less than the original contract price by $19,800.99.[2]

---

1. Port Newark is in New Jersey, but it is under the jurisdiction of the Port of New York Authority, a bi-state agency of New York and New Jersey.

2. Intermeat initially demanded that American Poultry arbitrate the dispute over the balance of the contract price before the American Arbitration Association in New York. American Poultry countered by filing a suit in the United States District Court for the Northern District of Ohio seeking an injunction against arbitration in New York. In reply, Intermeat filed a motion for summary judgment ordering arbitration in New York. This motion was denied, and Intermeat voluntarily withdrew its demand for arbitration. American Poultry thereupon voluntarily discontinued the Ohio action. Intermeat then filed a complaint in the Supreme Court of New York, asking money damages for breach of contract. The case was removed to the District Court resulting in the judgment previously mentioned.

## I. *Jurisdiction*

█ The jurisdiction of a federal court over the person of a foreign corporation in a diversity action involves questions of both state and federal law. The defendant must be subject to service of process under the law of the state of the forum, a question of state law, FRCP 4, 64, and the exercise of such jurisdiction must be consistent with due process, a question of federal law. *Perkins v. Benguet Consolidated Mining Co.,* 342 U.S. 437, 440, 72 S.Ct. 413, 96 L.Ed. 485 (1952); *Arrowsmith v. United Press International,* 320 F.2d 219, 222–23 (2d Cir. 1963), citing *Pulson v. American Rolling Mill Co.,* 170 F.2d 193, 194–95 (1st Cir. 1948). In this case, we consider the effect of the new constitutional standard announced in *Shaffer v. Heitner, supra,* on the New York law authorizing jurisdiction based on the attachment in New York of a debt owed to a defendant foreign corporation. We are not concerned with personal service based on defendant's "doing business" in the state, N.Y. C.P.L.R. § 301, nor with activity arising out of a contract executed in New York. N.Y. C.P.L.R. § 302.

New York law provides for the attachment of any debt, "whether it was incurred within or without the state, to or from a resident or non-resident." N.Y. C.P.L.R. §§ 6202, 5201. Once a debt owed to a foreign corporation is attached in New York, the foreign corporation may be personally served with a summons outside of the state, or, in some instances, served by publication. N.Y. C.P.L.R. §§ 314, 315. These general rules, with variations of detail unimportant here, have long been part of the law of New York. *Morris Plan Industrial Bank v. Gunning,* 295 N.Y. 324, 329–30, 67 N.E.2d 510 (1946); *National Broadway Bank v. Sampson,* 179 N.Y. 213, 222–23, 71 N.E.766 (1904); and *Cohn v. Enterprise Distributing Corp.,* 214 App.Div. 238, 238–40, 212 N.Y.S. 39 (1925). *And see Simpson v. Loehmann,* 21 N.Y.2d 305, 310, 287 N.Y.S.2d 633, 234 N.E.2d 669 (1967); *Seider v. Roth,* 17 N.Y.2d 111, 269 N.Y.S.2d 99, 216 N.E.2d 312 (1966). The Supreme Court, in *Harris v. Balk,* 198 U.S. 215, 25 S.Ct. 625, 49 L.Ed. 1023 (1905), established the constitutionality of such jurisdiction, even where the debt attached was unrelated to the plaintiff's cause of action and the defendant had no ties to the forum state except the debt attached. The Court specifically approved the New York law of attachment under the old Civil Practice Act §§ 233, 902, and 903 in *Huron Holding Corp. v. Lincoln Mine Operating Company,* 312 U.S. 183, 61 S.Ct. 513, 85 L.Ed. 725 (1941).

As long ago as 1930, Judge Learned Hand, uncomfortable with the fiction of a corporate "presence" as the basis for jurisdiction over foreign corporations, suggested what he termed a "practical test." Stated simply, it was "whether the extent and continuity of what it has done in the state in question makes it reasonable to bring it before one of its courts." *Hutchinson v. Chase & Gilbert,* 45 F.2d 139, 141 (2d Cir. 1930). Following Judge Hand's lead, the Supreme Court reformulated the constitutional limit on *in personam* jurisdiction in *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). In resisting a levy of an unemployment tax by the State of Washington on the commissions received by International Shoe's salesmen in the state, the corporation argued that its activities within the state were not so continuous and systematic as to make it present within the state. The Court rejected that argument, holding that the demands of due process "may be met by such contacts of the corporation with the state of the forum as make it reasonable, in the context of our federal system of government, to require the corporation to defend the particular suit which is brought there." 326 U.S. at 317, 66 S.Ct. at 158. Though the obligation sued upon in *International Shoe* arose directly out of the corporation's limited activities within the state, the Court made it clear that the general standard it announced should be applied to test the constitutionality of any assertion of *in personam* jurisdiction. 326 U.S. at 317–19, 66 S.Ct. 154. The rejection of the "doing business" and "presence" formulations as the limits of state jurisdiction over nonresidents was confirmed in *McGee v. International*

*Life Insurance Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), where the Court upheld the power of the state to subject a foreign corporation to suit in its courts on an isolated insurance contract which had "substantial connection with that state". The Court noted that "with this increasing nationalization of commerce has come a great increase in the amount of business conducted by mail across state lines. At the same time modern transportation and communication have made it less burdensome for a party sued to defend himself in a State where he engages in economic activity." *Id.*

The Supreme Court's shift from the "presence" test of jurisdiction to the "minimum contacts-fairness" test in *International Shoe* did not turn on the *in personam* nature of the jurisdiction asserted in that case, however. The New York Court of Appeals, in *Simpson v. Loehmann, supra,* 21 N.Y.2d at 311–12, 287 N.Y.S.2d at 637, 234 N.E.2d at 672, recognized that the due process standard laid down in *International Shoe* might be equally applicable to exercises of the *quasi-in-rem* jurisdiction authorized by New York law. "The historical limitations on both in personam and in rem jurisdiction, with their rigid tests, are giving way to a more realistic and reasonable evaluation of the respective rights of the plaintiffs, defendants and the State in terms of fairness."

In any event, New York, before *Shaffer v. Heitner, supra,* when it found that money was owed by New York obligors to a nonresident defendant, exercised jurisdiction by attachment to the amount of the debt, even though the defendant had no contact with New York other than the situs of the debt. *See, e.g., Katz v. Liston,* 22 A.D.2d 205, 254 N.Y.S.2d 389 (App.Div. 1st Dep't 1964), cited with approval in *Donawitz v. Danek,* 42 N.Y.2d 138, 142 footnote, 397 N.Y.S.2d 592, 366 N.E.2d 253 (1977).[3]

In *Shaffer v. Heitner, supra,* decided on June 24, 1977, the Supreme Court held that the "minimum contacts" standard of due process set down for *in personam* jurisdiction in *International Shoe* should be used also to test jurisdiction based on the attachment of property. In *Shaffer v. Heitner,* a nonresident of Delaware filed a shareholder's derivative suit in Delaware Chancery Court, naming as defendants a corporation and its subsidiary, as well as twenty-eight present or former corporate officers or directors. The plaintiff also obtained a sequestration order under the Delaware statute, sequestering the shares and options of the Delaware corporation held by the nonresident defendants. The Delaware Supreme Court held that *International Shoe* raised no constitutional barrier to the sequestration procedure because "jurisdiction under § 366 remains . . . *quasi-in-rem* founded on the presence of capital stock [in Delaware], not on prior contacts by defendants with this forum." The Delaware Supreme Court specifically held "that seizure of the Greyhound shares is not invalid because plaintiff has failed to meet the prior contacts test of *International Shoe," Greyhound Corp. v. Heitner,* 361 A.2d 225, 229 (Del.Supr.1976). The United States Supreme Court reversed. It held that the due process test of *International Shoe* applied to actions commenced by attachment, and that under that test the attachment in the forum state of property of the defendant unrelated to the plaintiff's suit is alone not sufficient to confer jurisdiction over the foreign defendant.

"[A]ny assertion of state court jurisdiction must satisfy the *International Shoe* standard. . . . [A]lthough the presence of the defendant's property in a State might suggest the existence of other ties among the defendant, the State,

---

**3.** We put to one side the cases which have upheld *quasi-in-rem* jurisdiction through the attachment of an insurer's obligation to defend an action sounding in tort. *Seider v. Roth, supra,* and *Simpson v. Loehmann, supra. But cf. Donawitz v. Danek, supra.* The question of whether such an agreement to defend, made

before the accident, is an attachable "debt" does not concern us here. *Donawitz v. Danek, supra,* was decided on June 14, 1977, ten days *before Shaffer* was decided, and there has been no decision by the New York Court of Appeals under the attachment statutes since *Shaffer.*

and the litigation, the presence of the property alone would not support the State's jurisdiction."

433 U.S. 208–09, 97 S.Ct. 2582. In reaching its decision that the Delaware sequestration statute as applied in *Shaffer v. Heitner* violated due process requirements, the Court revised longstanding constitutional doctrine that was in the process of critical erosion. Speaking through Mr. Justice Marshall, the Court accepted the idea that a proceeding "against" property is actually a proceeding against the owner of the property. The Court made it clear that this entailed the rejection of the broad rule of *Harris v. Balk, supra,* which held that the presence of property within a state gave that state constitutional authority to enter a valid judgment against the owner of the property to the extent of the value of the property, even though the property was unrelated to the claim sued upon and even though the defendant had no contact with the forum. The Court did not indicate total disapproval of *Harris v. Balk,* for it noted that attachment of a debt is proper wherever the debtor is found, if the attachment is authorized by the law of the state. *Shaffer v. Heitner, supra,* 433 U.S. at 210, 97 S.Ct. 2569.

■ The application of the "minimum contacts" standard to proceedings begun by attachment now means that the presence of the defendant's property within New York must be viewed as only one contact of the defendant with the state, to be considered along with other contacts in deciding whether the assertion of jurisdiction is consistent with "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington, supra,* 326 U.S. at

316, 66 S.Ct. at 158; *Shaffer v. Heitner, supra,* 433 U.S. at 209, 97 S.Ct. 2569. Hence, some attachments still valid under New York law, and still constituting valid bases (so far as New York law is concerned) for *quasi-in-rem* jurisdiction, will no longer satisfy the applicable due process requirement where the defendant has less than minimum contacts with New York.[4]

The constitutional standard of due process may be met by fewer contacts, however, than those required under the more restrictive statutory test of "doing business," N.Y. C.P.L.R. § 301, as the New York Court of Appeals implicitly recognized in *Simonson v. International Bank,* 14 N.Y.2d 281, 286–88, 251 N.Y.S.2d 433, 200 N.E.2d 427 (1964), or the (possibly) more restrictive test of "transacting business," N.Y. C.P.L.R. § 302, since neither of these statutes governs jurisdiction based on attachment.

■ The difference between an *in personam* jurisdiction and a jurisdiction by attachment of a debt is that, in the former case, sitting as a New York court in a diversity case, we would have to decide the continued strength of the "doing business" concept in New York law, and hence decide whether the acts done in New York by American Poultry were enough to support such jurisdiction under N.Y. C.P.L.R. § 301,[5] as well as enough to satisfy the test of *International Shoe.* On the other hand, in dealing with jurisdiction based upon an attachment, the test is narrower. The test is not whether the defendant is "doing business" in New York, a concept which a state, if it wishes to, is still free to assert as a minimum requirement, but whether there are sufficient minimum contacts to make it fair and just that the foreign corporation be

4. *See, e.g., Kennedy v. Deroker,* 91 Misc.2d 648, 398 N.Y.S.2d 628 (1977); *Katz v. Umansky,* 92 Misc.2d 285, 399 N.Y.S.2d 412 (1977); and *Wallace v. Target Store, Inc.,* 98 Misc.2d 454, 400 N.Y.S.2d 478 (1977). These were cases after *Shaffer* in which the *Seider-Simpson* doctrine—attachment in a tort case of the insurer's policy as a ground for jurisdiction over a nonresident defendant—was asserted and rejected. *See* note 3 *supra. But cf. O'Connor v. Lee-Hy Paving Corp.,* 437 F.Supp. 994 (E.D.N.Y.1977) (appeal pending).

5. This is on the assumption that the contract was not "executed" in New York, for if the defendant "transacts any business in the state" and the cause of action "arose" from that transaction, there would be jurisdiction under N.Y. C.P.L.R. § 302(a)(1) and (b). *Cf. Standard Wine & Liquor Co. v. Bombay Spirits Co.,* 20 N.Y.2d 13, 281 N.Y.S.2d 299, 228 N.E.2d 367 (1967); *Agrashell, Inc. v. Bernard Sirotta Co.,* 344 F.2d 583 (2d Cir. 1965).

required to come to New York to defend the action that was begun by attachment.

■ The "minimum contacts" test cannot be formularized. Rather, as Judge Hand suggested, such a test leaves the court to "step from tuft to tuft across the morass," *Hutchinson v. Chase & Gilbert, supra,* 45 F.2d at 142, deciding in each case whether the relationship among the plaintiff, the defendant, and the forum state make it fair and reasonable to compel the defendant to try the action in the forum state. In the case at bar, we agree with the District Court that its exercise of jurisdiction over American Poultry was consistent with due process.

■ We deal here with a contract which, if it was not born in New York, was at least conceived here. It was sent from the plaintiff in New York to the defendant in Ohio. The claim for relief "was based on a contract which had substantial connections with that State." *See McGee v. International Life Ins. Co., supra,* 355 U.S. 223, 78 S.Ct. 201. And while we need not decide whether *in personam* jurisdiction could have attached in this case, it seems evident that the "substantial connection" of the contract with New York must be considered along with the added factor of the attachment of an intangible within the jurisdiction of the state in weighing the "minimum contacts" required for Fourteenth Amendment due process, particularly since the debtor was doing business in New York. In addition, American Poultry a Cleveland firm, purchases a large percentage of its meat through New York importers, sometimes taking delivery of the meat at Port Newark. In the past few years it has contracted at least five times with Intermeat, a New York corporation, for such import purchases. Moreover, it twice signed and returned to Intermeat contracts committing it to arbitration in New York of disputes with Intermeat. In other transactions, American Poultry consented to arbitration in New York by retaining without objection Intermeat's form contract, which included the New York arbitration clause. N.Y. U.C.C. § 2–201(2). Consent to arbitration in New York is a consent to personal jurisdiction of the courts in New York. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lecopulos,* 553 F.2d 842 (2d Cir. 1977). Where a corporation located in another state is continuously involved in the commerce of New York and has repeatedly consented to arbitration in New York, we see nothing unfair or unreasonable in requiring it to defend in New York an action arising out of such commerce. Even if American Poultry was not "doing business" in New York under N.Y. C.P.L.R. § 301, it had enough "minimum contacts" with New York to satisfy the requirements of due process.

On this appeal we need not consider a possible alternative ground for upholding jurisdiction—jurisdiction by consent. It is clear that if American Poultry did agree to arbitrate this dispute in New York, and if Intermeat did not waive its right to demand arbitration before it filed suit in New York, the District Court could have exercised personal jurisdiction over American Poultry and ordered arbitration. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lecopulos, supra.* Because the District Court properly exercised jurisdiction under New York's attachment law, however, and because Intermeat does not appeal the District Court's refusal to order arbitration, we need not decide if an issue of fact exists whether American Poultry agreed to arbitrate the contract in suit, or whether Intermeat waived its rights under such an agreement by its conduct.

## II. *The Merits*

The broker's confirmation of the sale described the meat sold by Intermeat to American Poultry as "Frozen Australian Cowmeat (Richardson Production)." Intermeat's contract of sale, sent to American Poultry as a confirmation of its acceptance of the order, described the meat as "Australian 3rd mfg. cow crops and hinds, Richardson Production." Intermeat's contract of sale contained no description of the packing of the goods, while the broker's confirmation specified only "Packed net wt. 60 lb. Black boxes." The evidence at trial showed

that the cartons containing the meat were marked "Tasmeats," and that American Poultry based its rejection on the claimed failure of Intermeat to tender Richardson Production.

 There is no doubt that the perfect tender rule applies to measure the buyer's right of initial rejection of goods under U.C.C. § 2–601. Neither the broker's confirmation nor the contract of sale, however, called for any particular markings on the cartons. The District Court found that in the trade in which both parties are engaged as merchants, it is common knowledge that "Tasmeats" is the equivalent of "Richardson Production," and concluded that Intermeat had delivered the exact product called for by its agreement with American Poultry. This conclusion was amply supported by the evidence in the record, which included evidence that Richardson Production is only available in the United States under the brand name of its wholly-owned subsidiary, Tasmeats. We affirm its holding that rejection of the shipment by American Poultry was wrongful.

III. *Damages*

Appellant limited its argument on the merits to the contention that it had "rightfully" refused to accept the goods under U.C.C. § 2–601, an argument which we have rejected. It has urged no different measure of damages than the one applied by the court—the difference between the purported proceeds received by the plaintiff from the sale of the goods on the order of the plaintiff and the contract price. We, therefore, do not review that aspect of the measure of damages.

The only question of damages remaining is raised by the plaintiff seller. The court awarded interest at the New York legal rate of 6% on the total purchase price from April 4, 1974 to June 21, 1974 and on $19,-800.99 from June 21, 1974 to July 21, 1977. The plaintiff contends that it is entitled to recover its financing charges resulting from the breach in lieu of the statutory interest awarded by the court. Plaintiff bases its argument on U.C.C. § 2–706(1) which

makes the buyer liable to the seller, in the case of wrongful breach, for "the difference between the resale price and the contract price together with any incidental damages allowed under the provisions of Section 2–710." Section 2–710 reads:

"Incidental damages to an aggrieved seller include any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach."

In *Neri v. Retail Marine Corp.*, 30 N.Y.2d 393, 334 N.Y.S.2d 165 (1972), where the Court of Appeals applied as the proper measure of damages to the seller his loss of profit under § 2–708, it allowed finance charges as part of the "incidental damages" provided for in § 2–710. *See also Frostifresh Corp. v. Reynoso*, 54 Misc.2d 119, 281 N.Y.S.2d 964 (1967). The court reasoned that the purpose of the Commercial Code was "to put the seller in as good a position as performance would have done." § 2–708(2). The significance of the decision for our purposes is that the Court of Appeals did not limit the scope of "incidental damages" to include only the activities enumerated in § 2–710 such as transportation, care and custody of the goods. It apparently gave a broad meaning to "reasonable charges, expenses or commissions incurred", reimbursement of which was necessary to make the plaintiff whole.

 Since we are interpreting New York law, we must attempt to harmonize our result with a fair reading of *Neri, supra*. In so doing, we hold that "incidental expenses" in the U.C.C. include financing charges incurred incidental to the breach, as distinguished from consequential damages resulting from relations with third parties.

 We accordingly direct the District Court to amend the judgment by withdrawing the award of statutory interest for those periods during which the seller incurred financing charges directly attributable to the shipment rejected by American

Poultry, and awarding in lieu thereof the finance charges actually incurred.

The judgment is, in all other respects, affirmed.