TAMPIMEX OIL LIMITED, Plaintiff,

v.

LATINA TRADING CORPORATION,
Defendants.

No. 83 Civ. 1391 (RWS).

United States District Court,
S.D. New York.

March 7, 1983.

Boulanger, Finley & Hicks, New York City (J. Portis Hicks, John J. Finley, New York City, of counsel), for plaintiff.

Breed, Abbott & Morgan, New York City (Melvin Goldstein, Hauppauge, David S. Patterson, New York City, of counsel), for defendant.

## OPINION AND ORDER

LEVAL, District Judge.

Plaintiff obtained an ex parte order of attachment of more than $1,500,000 of the defendant's property held in a bank account in New York. Defendant moves to vacate that order, and to dismiss the complaint for lack of jurisdiction and/or improper venue. Defendant's motions are denied.

I note as a preliminary matter that these motions have been submitted on an expedited basis and that the parties have had little opportunity to prepare a factual record. I find that plaintiff has shown entitlement to maintain the attachment. This finding is without prejudice to reconsideration if it should be warranted by further development of the factual record.

Plaintiff Tampimex Oil Limited and defendant Latina Trading Corp. entered into a contract on January 20, 1983 pursuant to which Latina agreed to purchase 500,000 barrels of oil from Tampimex at agreed prices in the vicinity of $32 per barrel. The contract which was made by telex provided that delivery was to take place, at Tampi-

mex' option, between Feb. 1 and Feb. 28, 1983, on fifteen days notice. Other terms were: "Law: English .... Arbitration: London .... Shell's general terms and conditions will apply to above contract." The parties dispute what was meant by "Shell's general terms and conditions." Defendant contends that this refers to the General Terms and Conditions of a contract form of Shell International Trading Company; plaintiff contends that it refers to the terms and conditions of a contract form of Shell U.K. Limited. The Shell International terms contain a price renegotiation clause. The Shell U.K. terms do not.

Oil prices fell precipitously after the parties entered into the contract. On January 27, 1983, defendant advised plaintiff that it desired to renegotiate the price pursuant to its understanding of the Shell general terms and conditions incorporated in the contract. Defendant advised plaintiff on February 2 that defendant would not accept delivery at the contract price. Plaintiff then arranged to sell the oil to a third party at a price below the contract price and received at least $1,500,000 less than it would have under the contract.

■ First I find that plaintiff has made a showing of sufficient contacts of the defendant with New York to warrant the exercise of jurisdiction over the defendant by the New York courts upon the attachment. Since the decision of *Shaffer v. Heitner,* 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), the seizure of an asset alone has been insufficient basis for assertion of *quasi in rem* jurisdiction. However, the attachment of a defendant's asset, coupled with "sufficient minimum contacts [as] make it fair and just that the foreign corporation be required to come to [the state] to defend the action," complies with constitutional standards. *Intermeat, Inc. v. American Poultry Inc.,* 575 F.2d 1017 (2d Cir.1978).

Plaintiff has demonstrated sufficient contacts of the defendant with New York to make it altogether fair and just that the defendant respond to this action in the courts of New York. Indeed it is highly possible, although I need not decide at this time, that defendant's contacts with New York would be sufficient to found jurisdiction on the New York CPLR long arm statute, § 301, and possibly also § 302(a)(1).

Although the defendant corporation apparently maintains neither office nor employees in New York, it conducts regular large scale commercial activity in New York through agents. As shown in the affidavit of Billy H. Wilson, Triad Petroleum Inc., an oil broker, has repeatedly acted for defendant in connection with the negotiation of terms and conditions of petroleum sales, and the acceptance and confirmation of such transactions. Defendant's manager Karen Sheppard on her deposition confirmed defendant's use of the New York broker to enter into petroleum transactions. (Any quibbles as between Wilson's and Sheppard's description of the scope of the agent's authority appear irrelevant to the resolution of this dispute, the significant fact being the regular use of a New York agent to enter into contracts).

Furthermore, defendant has utilized a bank in New York to issue letters of credit and make payments on its behalf at the rate of ten per month over a period of two years and to receive payments for its benefit at the rate of 10 per month over the same period. The bank has also acted for defendant making at least one transfer of funds abroad in an amount in the millions. Payment on the instant contract was to be made on defendant's behalf by the New York bank under its letter of credit.

Given the regularity of large transactions carried out in New York for defendant's account by agents on its behalf, it seems perfectly clear that the minimum contacts test is completely satisfied.

■ I further find that plaintiff has demonstrated its entitlement to attachment under the terms of the New York statute, CPLR §§ 6201 et seq. In order to obtain or confirm an order of attachment, a plaintiff must demonstrate "that there is a cause of action, that it is probable that the plaintiff will succeed on the merits, that one or more of the grounds for attachment provided in

[CPLR] section 6201 exist, and that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff." CPLR § 6212(a). Section 6201 authorizes attachment where a plaintiff seeks a money judgment from a foreign corporation not qualified to do business in New York. CPLR § 6201(1). Defendant is a foreign corporation not qualified to do business in New York. The fact that the parties have agreed in the contract to arbitrate disputes in London does not preclude plaintiff from instituting an action or securing an attachment in New York. *See Sperry International v. Israel,* 689 F.2d 301 at 306 (2d Cir.1982); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lecopulos,* 553 F.2d 842 (2d Cir.1977), although it may well call for stay of the action while arbitration proceeds.

I find also that plaintiff has demonstrated probability of success on the merits. First I think it unlikely for reasons set forth below that a court or arbitrator would construe this contract in accordance with defendant's contention, as incorporating the General Terms and Conditions of the Shell International Trading Company contract. But even if it were so construed, defendant would nonetheless be in breach of those terms.

The Shell International Trading Company contract is one governing a type of transaction significantly unlike the transaction in question. It is a form which governs supply contracts under which the parties agree to the continuing delivery and continuing acceptance of supplies of oil over a substantial duration ("Period of Supply"). Because the purpose of such a contract is more to insure availability of a continuing supply of a needed commodity, than to speculate on future prices, and because of the recognition of the possibility of price swings during the Period of Supply", the contract provides for renegotiation if either party considers that the contract price falls out of line with prevailing international market levels. It provides for a 30 day renegotiation period after the request for revision, and an option to terminate at the end of the 30 day period unless a new agreement supplants the price.

The present contract presents fundamentally different purposes and circumstances which make the renegotiation terms at least highly inappropriate, if not fundamentally incompatible, with the transaction. This was a one shot spot purchase of a single cargo of 500,000 barrels at an agreed price for delivery (at the seller's option) during the calendar month following the contract. It is difficult to see how the renegotiation terms of the long term supply contract could sensibly apply to such a sale, and most unlikely on the present state of the record that a court or arbitrator would construe the imprecise reference to "Shell's general terms and conditions" as intending to incorporate them.

But, as noted above, even if the contract were so construed, defendant appears to be in breach. The renegotiation clause does not permit termination until 30 days after notice and requires the parties to continue to perform at the previously agreed price during such 30 day period. The defendant buyer here gave notice on February 2, only 6 days after its demand for renegotiation, that it would not accept the purchase. Plaintiff meanwhile as seller had the right to deliver at its option on any day between February 1 and February 28, after giving fifteen days notice of a three day lay period. The buyer had clearly repudiated the sale prior to the expiration of the seller's time for giving notice of delivery. The seller was accordingly justified in treating the contract as repudiated by the purchaser and was not obliged to go through the unnecessary (and risky) charade of giving fifteen days notice when the purchaser had already declared its intention not to perform.

Plaintiff has also demonstrated that defendant has no counterclaims against plaintiff. Although defendant may have claims against a company that is affiliated with the plaintiff, nothing in the record more than Edward Ryan's unsubstantiated statement that defendant understands that the affiliated company is a division of the plaintiff reveals any potential claims against the plaintiff.

Furthermore, although under existing law additional grounds do not appear necessary to satisfy either New York requirements or those of the Constitution, there are substantial indications that defendant is engaged in transferring assets abroad, possibly for the purpose of evading creditors. In early February defendant instructed its New York bank to transfer to Switzerland two to three million dollars in proceeds to be received. The instruction added "Under no circumstances are you to deposit such funds into [defendant's] account with your bank. They are to be wired direct upon receipt as instructed below."

In conclusion, defendant has failed to demonstrate entitlement to vacate the attachment or to dismiss the action. Its motion is denied. Plaintiff must move within 5 days after levy for confirmation of the attachment, C.P.L.R. § 6211(b).

SO ORDERED.