## ARMSTRONG FORD, INC., Plaintiff

### v.

## GOVERNMENT OF THE VIRGIN ISLANDS, Defendant

Civil No. 1065/82

Territorial Court of the Virgin Islands

Div. of St. Croix at Kingshill

December 17, 1984

---

[5] See, n.2, supra.

RICHARD KEELING, ESQ., Christiansted, St. Croix, V.I., *for plaintiff*

MICHAEL STEWART MCLAURIN, ESQ., Assistant Attorney General (Office of the Attorney General), Christiansted, St. Croix, V.I., *for defendant*

SILVERLIGHT, *Judge*

## MEMORANDUM OPINION

This matter comes before the Court upon a bench trial to determine whether the defendant, Government of the Virgin Islands, committed a breach of contract when it rejected the bus for the transportation of handicapped children, which had been delivered by plaintiff, Armstrong Ford, Inc., pursuant to defendant's contract award. For the reasons set forth below, this Court finds that defendant did breach the contract.

## FACTS

On October 26, 1979, plaintiff, Armstrong Ford, Inc., was awarded supply contract number SC-7-E-001-801, pursuant to an invitation for bids which had been issued on October 1, 1979. This contract required plaintiff to supply:

(1) 1980 Production 17 Passenger Bus (15 seated, 2 wheelchair) specially equipped with a hydraulic wheelchair lift installed and tiedowns. Body mounted on cab and chassis cutaway, adapted for transporting handicapped children, conforms with all National Highway Safety Requirements, meeting the following specifications:

American manufactured 17 passenger bus.

The contract price of said unit was Twenty-Four Thousand Nine Hundred Eighty-Nine and Eleven Cents ($24,989.11) with a Three Hundred Dollar ($300.00) discount to defendant, Government of the Virgin Islands, if payment was made within twenty (20) days after billing.

The evidence discloses that the bus was sent to the Motor Pool of the Department of Property and Procurement, St. Thomas during the latter part of August 1980. It was inspected by defendant on September 2, 1980. Within a week of the August delivery, plaintiff performed what is known in the industry as "dealer prep" or "predelivery".[1] A memorandum prepared by Levron Sarauw, Deputy Commissioner, Division of Transportation and dated October 10, 1980, recommended rejection of the bus on the grounds that the entrance door and the wheelchair lift were inoperable, the pollution pump was "seized up," and the exterior was corroded. (Defendant's Exhibit "F".) Plaintiff was notified of defendant's rejection of the

---

[1] "Predelivery" or "dealer prep" consists of assessing and, if necessary, repairing any damage which may have occurred during transportation, determining whether the vehicle is operational and rustproofing the vehicle.

215

vehicle by letter dated November 13, 1980, and was asked to remove the same from the motor pool immediately. (Defendant's Exhibit "J".) There were ongoing negotiations between the parties which culminated in a meeting sometime in March 1982. There, it was decided that plaintiff would be allowed to correct any remaining deficiencies in the vehicle. Towards the end of March 1982, plaintiff reconditioned the bus by removing rust on the brake rotor and windshield; replacing a solenoid on the wheelchair lift; replacing the thermac pump; undercoating a chassis cross bar and waxing and buffing the vehicle. A March 30, 1982, inspection by Louis Berry, District Supervisor, Division of Transportation, revealed rust in 10 areas of the bus. On June 3, 1982, plaintiff was notified by Herman Richardson that the vehicle would be rejected since corrosion remained on ten (10) areas of the bus. Plaintiff subsequently shipped the bus to St. Croix in June 1982. In February 1984, plaintiff sold the bus, less the wheelchair lift to Travelers Tours of St. Croix for Eighteen Thousand Five Hundred Dollars ($18,500.00).

## IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

 The first issue presented to this Court is whether 11A V.I.C. § 2—315, Implied Warranty of Fitness for a Particular Purpose, is applicable to the vehicle in question. Three conditions must exist in order to invoke the implied warranty of fitness for a particular purpose:

(1) The seller must have reason to know the buyer's particular purpose.
(2) The seller must have reason to know that the buyer is relying on the seller's skill or judgment to furnish appropriate goods.
(3) The buyer must, in fact, rely upon the seller's skill and judgment.

Gumbs v. International Harvester, Inc., 718 F.2d 88, 92 (3d Cir. 1983). The evidence supports a finding that an implied warranty of fitness existed in the instant case.

The evidence discloses that pursuant to defendant's invitation for bids, plaintiff submitted a bid to provide a seventeen (17) passenger bus (15 seated, 2 wheelchair), specially equipped with a hydraulic wheelchair lift installed and . . . adapted for transporting handicapped children. Generally, in the bidding process, the Government relies on a supplier's skill to furnish the appropriate goods by requir-

ing that the supplier submit bids delineating the units which he is capable of providing along with the costs associated with such items.[2]

■ Contrary to plaintiff's assertion, it is not required that "Armstrong Ford must have selected the bus or some component of the bus alleged to be defective" in order for an implied warranty of fitness for the particular purpose of transporting handicapped children to have existed. (Plaintiff's Brief at p. 11.) Neither is the fact that the bus was built by Thomas Body and Coach Company relevant in determining the existence of an implied warranty of fitness. Rather, the issue is whether defendant relied on plaintiff's skill or judgment to select the goods the buyer needed or furnished suitable goods for those needs. 3 Williston on Sales (4th ed. 1974).

■ In this instance, plaintiff, Armstrong Ford, is an automobile dealership which has been involved in the sale of a wide range of vehicles including buses, for a number of years. It purported to be able to supply to the Department of Education, Special Education Division, a bus capable of transporting handicapped children. Plaintiff's superior knowledge of the automotive industry compared with that of the Department of Education, raises at least an inference that defendant relied on plaintiff's judgment in selecting the materials necessary for the handicapped bus.

■■ It is unnecessary to prove an intent on the part of the seller to create an implied warranty of fitness for a particular purpose. It is the circumstances surrounding the making of the contract which gives rise to this warranty, rather than any explicit bargain between the parties. 3 Williston on Contracts § 19-6 (4th ed. 1974). Hence, in light of the bidding process and plaintiff's superior knowledge of the automotive industry, this Court finds that an implied warranty of fitness for the particular purpose of transporting handicapped children existed in this instance.

## BREACH OF IMPLIED WARRANTY OF FITNESS

■ We turn next to the issue of whether plaintiff breached its implied warranty of fitness for a particular purpose. In government contracts required by law to be made by bids, the parties are controlled solely by the terms of the contract, which is to be construed

---

[2] See, 31 V.I.C. § 236(c) (all bids shall contain a specific itemization of all units bid upon and the unit price thereof . . . ).

in connection with the invitation calling for bids, when referred to in the contract. 91 C.J.S. United States § 91 (1955).

Plaintiff contracted to supply the government with a bus, specially equipped with a hydraulic wheelchair lift and capable of transporting handicapped children. Towards the latter part of August 1980, and at defendant's request,[3] plaintiff sent the bus to defendant's motor pool in St. Thomas. The parties agreed that predelivery was to be performed by plaintiff at the motor pool. Plaintiff's manager, Roy Trantham, testified that prior to a full inspection by defendant, he was informed by the then Deputy Commissioner of Property and Procurement, Elmo Francois, that there was some indication that the vehicle would be unacceptable in its current condition. Defendant inspected the vehicle and prepared an inspection report, dated September 2, 1980, wherein the defective areas were enumerated as follows:

(1) the entrance door located on the left side behind the driver, and the wheelchair lift were inoperable;
(2) certain sections of the bus were corroded; and
(3) the pollution pump was "seized up."

(Defendant's Exhibit "E".)

■ Levron Sarauw, Deputy Commissioner of the Department of Property and Procurement, testified that plaintiff came to the motor pool subsequent to the production of the September 2, 1980, inspection report. This comports with Trantham's testimony that predelivery was performed on the vehicle within one (1) week of its initial delivery to the motor pool. At that time, plaintiff corrected all ascertainable defects by tightening a bracket in the top door guide of the entrance door; replacing a solenoid in the wheelchair lift mechanism; removing rust from the wheelchair lift and the pollution pump and buffing the exterior of the vehicle. Upon completion of predelivery, the bus was operable and was fit for its particular purpose of transporting handicapped children. Accordingly, plaintiff did not breach its implied warranty of fitness for a particular purpose.

---

[3] Because the Department of Education desired delivery of the bus prior to the date specified for delivery in the contract, it was agreed that the bus would be delivered to the St. Thomas motor pool rather than to plaintiff's dealership in St. Croix for redelivery to St. Thomas after predelivery work was performed.

## REJECTION OF GOODS

█ █ If the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may reject the whole.[4] Rejection of goods, however, must be within a reasonable time after their delivery.[5] It is ineffective unless the buyer seasonably notifies the seller.[6]

In the instant case, delivery did not occur until after plaintiff had performed predelivery. As noted earlier at footnote 3, it was at defendant's request that plaintiff sent the bus to defendant's motor pool in St. Thomas wherein plaintiff was to perform "dealer prep." Plaintiff's normal procedure in such matters would have been to perform predelivery at its automobile dealership in St. Croix. Defendant admits that subsequent to the September 2, 1980, inspection report, plaintiff was given one month to fix the defects. (Defendant's Brief at p. 3.) It admitted further that plaintiff came to the motor pool after the September 2, 1980, inspection. Yet the evidence before this Court is unrefuted that subsequent to plaintiff's predelivery, defendant made no further attempts to inspect the vehicle.

Defendant did, however, produce a series of internal memoranda each premised upon the September 2, 1980, inspection report. (Defendant's Exhibits "F" and "G".) These memoranda culminated in the issuance of the November 13, 1980, letter from Yvonne Phipps (Administrator of Property, Procurement and Auxiliary Services of the Department of Education) to Roy Trantham, confirming the discrepancies found by Francois and rejecting the vehicle. (Defendant's Exhibit "J".) Phipps testified that her letter was based upon the October 10, 1980, memorandum from the Acting Commissioner of Property and Procurement to the Commissioner of Education. (Defendant's Exhibit "G".) Again, Exhibit "G" was predicated upon Exhibit "F," which, in turn, was based on the inspection report. Defendant cannot claim that the bus was non-conforming at the time of its notification of rejection inasmuch as the problems delineated in the rejection letter had been remedied previously. Hence, defendant's rejection was wrongful.

█ Moreover, defendant's rejection did not occur within a reasonable time of delivery. Section 1—204 of the UCC provides that "a reasonable time for taking any action depends upon the nature,

---

[4] 11A V.I.C. § 2—601.

[5] 11A V.I.C. § 2—602.

[6] Id.

purpose and circumstances of such action." What is a reasonable time, however, is generally deemed a question of fact to be resolved by the factfinder. Yates v. Clifford v. Chrysler Corporation, 30 UCC Rep. 967, 973 (Pa. Super. Ct. 1980).

In the case at bar, defendant's rejection occurred almost two and one-half months after it had inspected the vehicle. The defects outlined in the rejection letter were the same as those which had been discovered during the September 2, 1980, inspection. Under the circumstances, since plaintiff corrected the deficiencies but defendant neither made further attempts to inspect the vehicle nor offered any evidence that the deficiencies which were the basis of the rejection letter of November 13, 1980, still existed, this Court finds defendant's rejection untimely and ineffective.

## DAMAGES

11A V.I.C. § 2—703 provides that where a buyer wrongfully rejects goods, the aggrieved seller may, among other things, resell and recover damages as provided under § 2—706. Where the resale is made in good faith and in a commercially reasonable manner, the seller may recover the difference between the resale price and the contract price, together with any incidental damages allowed under provisions of § 2—710, but less expenses saved in consequence of buyer's breach. 11A V.I.C. § 2—706.

In the instant case, the contract price was $24,989.11. The bus was resold for $18,500.00, but plaintiff retained the wheelchair lift which, at the time of the breach, had a fair market value of $6,000.00.

Plaintiff requests incidental damages as provided under 11A V.I.C. § 2—710. Incidental damages to an aggrieved seller include *any commercially reasonable charges, expenses or commissions* incurred in the transportation, care and custody of goods after the buyer's breach, in connection with return or resale of the goods or *otherwise resulting from the breach.* (Emphasis added.) Id.

In the case at bar, plaintiff claims that it incurred expenses of $500.00 for transporting the bus from St. Thomas to St. Croix and $400.00 for installing additional seats, in order to resell the vehicle. No evidence, however, was adduced at trial to support plaintiff's assertions. Accordingly, reimbursement for such costs will be denied.

Finally, plaintiff asks the Court to award as incidental damages, interest payments totalling $12,058.07, which were incurred on a

220

loan taken by the seller to finance the transaction. Those charges represent finance charges accrued and paid pursuant to plaintiff's floor plan agreement with Chase Manhattan Bank from the date of delivery in August 1980, through the date of resale in February 1984. In support of its position, plaintiff cites a line of cases from the Second Circuit wherein finance charges were deemed to have been incidental damages under Section 2—710 of the New York Uniform Commercial Code.

The issue of awarding interest charges incurred as a result of a buyer obtaining the bank loan used to purchase a car was addressed by the Third Circuit in Chatlos Systems, Inc. v. National Cash Register Corporation, 635 F.2d 1081 (3d Cir. 1980). In Chatlos, a buyer of a computer system brought suit against a seller to recover damages for a breach of warranty under UCC § 2—714.[7] The Third Circuit held that absent special circumstances, interest paid to the bank on the purchase price should not be included in the value of the goods as warranted. Id. at 1088. The court reasoned that

> interest represents the cost of the money borrowed to buy the goods because capital was not available to make a cash purchase. If, however, the buyer is awarded lump sum damages, he would be able to make a replacement purchase without borrowing and incurring interest expenses. To the extent, therefore, that the recovery included interest on the original purchase, it would constitute a windfall.

Id.

Chatlos is distinguishable from the instant case. Unlike the buyer in Chatlos, Armstrong Ford, as the seller, seeks to recover interest which accrued as a result of the buyer's breach as opposed to interest accrued for financing the loan in the first instance. Moreover, interest payments are being sought under different provisions of the code. Unlike Chatlos, the interest payments here are requested as incidental damages as provided under § 2—710 and not as part of the value of the goods as warranted.

This Court finds that the facts of this case are akin to those of the Second Circuit cases. Further, the rationale enunciated by that court is persuasive on the issue now before this Court, namely, re-

---

[7] Section 2—714 provides that the measure of damages for breach when the claim is for accepted goods is the difference between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount. N.J. Stat. Ann. § 12A: 2—714(2) (West 1962).

covery of interest accrued by reason of a *buyer's* breach. For instance, in Intermeat, Inc. v. American Poultry, Inc., 575 F.2d 1017 (2d Cir. 1978), the seller incurred finance charges directly attributable to a shipment of meat wrongfully rejected by the buyer. The seller based its claim on UCC § 2—706(1), which makes the buyer liable to the seller, in the case of wrongful breach, for "the difference between the resale price and the contract price together with any incidental damages allowed under the provisions of . . . (Section 2—710) . . . ."[8]

Similarly, the seller in this case is seeking to recover interest which accrued as a result of the buyer's wrongful rejection of the bus. The court in Intermeat reasoned that the purpose of the Commercial Code was to put the seller in as good a position as performance would have done, and gave a broad reading to the phrase "reasonable charges, expenses or commissions" under § 2—710. Id. at 1024.[9]

Likewise, in Bulk Oil, Inc. v. Sun Oil Trading Company, 697 F.2d 481 (2d Cir. 1983), the court held that post breach interest payments by the seller on a loan financing a Four Million Dollar ($4,000,000) transaction, under which the breaching buyer had contracted to buy fuel oil, were incidental damages under the New York Uniform Commercial Code § 2—710. The court followed the rationale of Intermeat and its predecessor Neri, in giving a broad reading to the phrase "reasonable charges, expenses or commissions incurred," reimbursement of which was necessary to make the plaintiff whole. It stated further that the treatment of a seller's finance charges should not depend on whether suit is brought under § 2—708, § 2—706 or § 2—709. Id. at 484.

■ The matter before this Court fits squarely within the facts of Neri, Intermeat and Bulk, supra. The actions of both the plaintiff and the defendant in this case are analogous to those of the parties in the New York cases. For instance, the plaintiff obtained financ-

---

[8] 11A V.I.C. §§ 2—706(1) and 2—710 are identical to the corresponding sections of the New York Uniform Commercial Code.

[9] The court in Intermeat followed the rationale proclaimed by the New York Court of Appeals in Neri v. Retail Marine Corp., 30 N.Y.2d 393, 285 N.E.2d 315, 334 N.Y.S.2d 165 (1972). There, the seller, a dealer in boats, contracted to sell a specified model to a customer. The customer made a substantial deposit to induce the seller to arrange with the manufacturer for immediate delivery. The dealer took delivery, but the customer reneged. The Court of Appeals awarded the dealer finance charges as part of incidental damages provided for in § 2—710 for the period between the date performance was due and the time of resale. Id. at 401.

ing in order to supply the bus and defendant then wrongfully rejected the goods. Had the Government paid the purchase price on time, Armstrong Ford would have paid off its indebtedness to Chase Manhattan and no further interest charges would have been incurred. Bulk, supra, at 484. Hence, this Court will award plaintiff interest charges accrued from the date performance was due in September 1980, through the date of resale in February 1984.

Accordingly, plaintiff's recovery will be as follows:

| | | |
|---|---|---|
| Contract price | | $24,989.11 |
| Less resale price | − | 18,500.00 |
| Subtotal | | 6,489.11 |
| Plus incidental damages | | |
| Interest payments | + | 12,058.07 |
| Subtotal | | 18,547.18 |
| Less amounts saved as a consequence of defendant's breach | | |
| Retention of wheelchair lift | − | 6,000.00 |
| Total | | $12,547.18 |

Further, attorney's fees will be awarded to plaintiff upon submission of supporting affidavits in accordance with Lindy Builders.

## JUDGMENT

For the reasons set forth in the Memorandum Opinion filed on even date herewith, it is

ORDERED, ADJUDGED and DECREED that judgment be entered in favor of plaintiff and against defendant for the sum of $12,547.18, and it is further

ORDERED, ADJUDGED and DECREED that plaintiff be awarded reasonable attorney's fees pursuant to 5 V.I.C. § 541 upon submission of an appropriate affidavit in accordance with the requirements of Lindy Builders.