**APEX OIL COMPANY,**
Plaintiff–Appellee,

v.

**The BELCHER COMPANY OF NEW YORK, INC. and Belcher New Jersey, Inc., Defendants–Appellants.**

**No. 414, Docket 87–7596.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 5, 1988.
Decided Aug. 30, 1988.

Ronald H. Alenstein, New York City (Adam B. Gilbert, David S. Tannenbaum, Shea & Gould, New York City, of counsel), for defendants-appellants.

Debra L. Brown, New York City (Richard J. Wiener, Cadwalader, Wickersham & Taft, New York City, of counsel), for plaintiff-appellee.

Before TIMBERS, WINTER and ALTIMARI, Circuit Judges.

WINTER, Circuit Judge:

This diversity case, arising out of an acrimonious commercial dispute, presents the question whether a sale of goods six weeks after a breach of contract may properly be used to calculate resale damages under Section 2–706 of the Uniform Commercial Code, where goods originally identified to the broken contract were sold on the day following the breach. Defendants The Belcher Company of New York, Inc. and Belcher New Jersey, Inc. (together "Belcher") appeal from a judgment, entered after a jury trial before Judge McLaughlin, awarding plaintiff Apex Oil Company ("Apex") $432,365.04 in damages for breach of contract and fraud in connection with an uncompleted transaction for heating oil. Belcher claims that the district court improperly allowed Apex to recover resale damages and that Apex failed to prove its fraud claim by clear and convincing evidence. We agree and reverse.

## BACKGROUND

Apex buys, sells, refines and transports petroleum products of various sorts, including No. 2 heating oil, commonly known as home heating oil. Belcher also buys and sells petroleum products, including No. 2 heating oil. In February 1982, both firms were trading futures contracts for No. 2 heating oil on the New York Mercantile

Exchange ("Merc"). In particular, both were trading Merc contracts for February 1982 No. 2 heating oil—i.e., contracts for the delivery of that commodity in New York Harbor during that delivery month in accordance with the Merc's rules. As a result of that trading, Apex was short 315 contracts, and Belcher was long by the same amount. Being "short" one contract for oil means that the trader has contracted to deliver one thousand barrels at some point in the future, and being "long" means just the opposite—that the trader has contracted to purchase that amount of oil. If a contract is not liquidated before the close of trading, the short trader must deliver the oil to a long trader (the exchange matches shorts with longs) in strict compliance with Merc rules or suffer stiff penalties, including disciplinary proceedings and fines. A short trader may, however, meet its obligations by entering into an "exchange for physicals" ("EFP") transaction with a long trader. An EFP allows a short trader to substitute for the delivery of oil under the terms of a futures contract the delivery of oil at a different place and time.

Apex was matched with Belcher by the Merc, and thus became bound to produce 315,000 barrels of No. 2 heating oil meeting Merc specifications in New York Harbor. Those specifications required that oil delivered in New York Harbor have a sulfur content no higher than 0.20%. Apex asked Belcher whether Belcher would take delivery of 190,000 barrels of oil in Boston Harbor in satisfaction of 190 contracts, and Belcher agreed. At trial, the parties did not dispute that, under this EFP, Apex promised it would deliver the No. 2 heating oil for the same price as that in the original contract—89.70 cents per gallon—and that the oil would be lifted from the vessel *Bordeaux*. The parties did dispute, and vigorously so, the requisite maximum sulfur content. At trial, Belcher sought to prove that the oil had to meet the New York standard of 0.20%, while Apex asserted that the oil had to meet only the specifications for Boston Harbor of not more than 0.30% sulfur.

The *Bordeaux* arrived in Boston Harbor on February 9, 1982, and on the next day began discharging its cargo of No. 2 heating oil at Belcher New England, Inc.'s terminal in Revere, Massachusetts. Later in the evening of February 10, after fifty or sixty thousand barrels had been offloaded, an independent petroleum inspector told Belcher that tests showed the oil on board the *Bordeaux* contained 0.28% sulfur, in excess of the New York Harbor specification. Belcher nevertheless continued to lift oil from the ship until eleven o'clock the next morning, February 11, when 141,535 barrels had been pumped into Belcher's terminal. After pumping had stopped, a second test indicated that the oil contained 0.22% sulfur—a figure within the accepted range of tolerance for oil containing 0.20% sulfur. (Apex did not learn of the second test until shortly before trial.) Nevertheless, Belcher refused to resume pumping, claiming that the oil did not conform to specifications.

After Belcher ordered the *Bordeaux* to leave its terminal, Apex immediately contacted Cities Service. Apex was scheduled to deliver heating oil to Cities Service later in the month and accordingly asked if it could satisfy that obligation by immediately delivering the oil on the *Bordeaux*. Cities Service agreed, and that oil was delivered to Cities Service in Boston Harbor on February 12, one day after the oil had been rejected by Belcher. Apex did not give notice to Belcher that the oil had been delivered to Cities Service.

Meanwhile, Belcher and Apex continued to quarrel over the portion of the oil delivered by the *Bordeaux*. Belcher repeatedly informed Apex, orally and by telex, that the oil was unsuitable and would have to be sold at a loss because of its high sulfur content. Belcher also claimed, falsely, that it was incurring various expenses because the oil was unusable. In fact, however, Belcher had already sold the oil in the ordinary course of business. Belcher nevertheless refused to pay Apex the contract price of $5,322,200.27 for the oil it had accepted, and it demanded that Apex produce the remaining 48,000 barrels of oil owing under the contract. On February

17, Apex agreed to tender the 48,000 barrels if Belcher would both make partial payment for the oil actually accepted and agree to negotiate as to the price ultimately to be paid for that oil. Belcher agreed and sent Apex a check for $5,034,997.12, a sum reflecting a discount of five cents per gallon from the contract price. However, the check contained an endorsement stating that "[t]he acceptance and negotiation of this check constitutes full payment and final settlement of all claims" against Belcher. Apex refused the check, and the parties returned to square one. Apex demanded full payment; Belcher demanded that Apex either negotiate the check or remove the discharged oil (which had actually been sold) and replace it with 190,000 barrels of conforming product. Apex chose to take the oil and replace it, and on February 23 told Belcher that the 142,000 barrels of discharged oil would be removed on board the *Mersault* on February 25.

By then, however, Belcher had sold the 142,000 barrels and did not have an equivalent amount of No. 2 oil in its entire Boston terminal. Instead of admitting that it did not have the oil, Belcher told Apex that a dock for the *Mersault* was unavailable. Belcher also demanded that Apex either remove the oil *and* pay terminalling and storage fees, or accept payment for the oil at a discount of five cents per gallon. Apex refused to do either. On the next day, Belcher and Apex finally reached a settlement under which Belcher agreed to pay for the oil discharged from the *Bordeaux* at a discount of 2.5 cents per gallon. The settlement agreement also resolved an unrelated dispute between an Apex subsidiary and a subsidiary of Belcher's parent firm, The Coastal Corporation. It is this agreement that Apex now claims was procured by fraud.

After the settlement, Apex repeatedly contacted Belcher to ascertain when, where and how Belcher would accept delivery of the remaining 48,000 barrels. On March 5, Belcher informed Apex that it considered its obligations under the original contract to have been extinguished, and that it did not "desire to purchase such a volume [the 48,000 barrels] at the offered price." Apex responded by claiming that the settlement did not extinguish Belcher's obligation to accept the 48,000 barrels. In addition, Apex stated that unless Belcher accepted the oil by March 20, Apex would identify 48,000 barrels of No. 2 oil to the breached contract and sell the oil to a third party. When Belcher again refused to take the oil, Apex sold 48,000 barrels to Gill & Duffus Company. This oil was sold for delivery in April at a price of 76.25 cents per gallon, 13.45 cents per gallon below the Belcher contract price.

On October 7, 1982, Apex brought this suit in the Eastern District, asserting breach of contract and fraud. The breach-of-contract claim in Apex's amended complaint contended that Belcher had breached the EFP, not in February, but in March, when Belcher had refused to take delivery of the 48,000 barrels still owing under the contract. The amended complaint further alleged that "[a]t the time of the breach of the Contract by Belcher the market price of the product was $.7625 per gallon," the price brought by the resale to Gill & Duffus on March 23. Amended Complaint ¶¶ 25–26. In turn, the fraud claim asserted that Belcher had made various misrepresentations—that the *Bordeaux* oil was unfit, and unusable by Belcher; and that consequently Belcher was suffering extensive damages and wanted the oil removed—upon which Apex had relied when it had agreed to settle as to the 142,000 barrels lifted from the *Bordeaux*. Apex asserted that as a result of the alleged fraud it had suffered damages of 2.5 cents per gallon, the discount agreed upon in the settlement.

The case went to trial before Judge McLaughlin and a jury between February 3 and February 13, 1986. As it had alleged in its pleadings, Apex asserted that its breach-of-contract claim was based on an alleged breach occurring *after* February 11, 1982, the day Belcher rejected the oil on board the *Bordeaux*. Judge McLaughlin, however, rejected this theory as a matter of law. His view of the case was that Belcher's rejection of the *Bordeaux* oil occurred under one of two circumstances: (i) either the oil conformed to the proper sul-

fur specification, in which case Belcher breached; or (ii) the oil did not conform, in which case Apex breached. Judge McLaughlin reasoned that, if Belcher breached on February 11, then it could not have breached thereafter. If on the other hand Apex breached, then, Judge McLaughlin reasoned, only under the doctrine of cure, see N.Y.U.C.C. § 2–508 (McKinney 1964), could Belcher be deemed to have breached. Apex, however, waived the cure theory by expressly disavowing it (perhaps because it presumes a breach by Apex). Instead, Apex argued that, regardless of whether the *Bordeaux* oil had conformed, Belcher's refusal throughout February and March 1982 to accept delivery of 48,000 barrels of conforming oil, which Belcher was then still demanding, had constituted a breach of contract. Judge McLaughlin rejected this argument, which he viewed as simply "an attempt to reintroduce the cure doctrine."

In a general verdict, the jury awarded Apex $283,752.94 on the breach-of-contract claim, and $148,612.10 on the fraud claim, for a total of $432,365.04. With the addition of prejudgment interest, the judgment came to $588,566.29.

Belcher appeals from this verdict. Apex has not taken a cross-appeal from Judge McLaughlin's dismissal of its post-February 11 breach theories, however. The parties agree, therefore, that as the case comes to us, the verdict concerning the breach can be upheld only on the theory that, if Belcher breached the contract, it did so only on February 11, 1982,[1] and that the oil sold to Gill & Duffus on March 23 was identified to the broken contract.

## DISCUSSION

The Uniform Commercial Code, adopted by New York in 1964, provides various remedies to sellers for default by buyers. An aggrieved seller may, for example, withhold delivery of goods, cancel the contract, recover the unpaid price of accepted goods, or recover damages for nonaccepted or repudiated goods based on their market price. See generally N.Y.U.C.C. § 2–703 (McKinney 1964). In addition, a seller may, as Apex seeks to do, fix its damages by reselling the goods and recovering from the buyer the difference between the resale price and the contract price. Specifically, Section 2–706 of the Code provides in pertinent part:

(1) Under the conditions stated in Section 2–703 on seller's remedies, the seller may resell the goods concerned or the undelivered balance thereof. Where the resale is made in good faith and in a commercially reasonable manner the seller may recover the difference between the resale price and the contract price together with any incidental damages allowed under the provisions of this Article (Section 2–710), but less expenses saved in consequence of the buyer's breach.

(2) Except as otherwise provided in subsection (3) or unless otherwise agreed resale may be at public or private sale

---

**1.** Whether the jury understood exactly what it was supposed to decide remains uncertain, for nowhere did the charge explain that any breach by Belcher must have occurred on February 11, 1982. Indeed, the charge was entirely silent as to the timing of the alleged breach, and in summation Apex emphasized Belcher's post-February 11 intransigence to the jury. Belcher asked the district court to "give the jury a charge that if Apex did not deliver conforming product on February 11, 1982, then the verdict on the contract claim should be in favor of Belcher." After first noting that "[i]t sounds right," the district court nevertheless denied the request without explanation. And in summation shortly thereafter, counsel for Apex noted, over Belcher's objection:

Now, thereafter what happened? Apex continued to tender the additional 48 thousand.

That is, they attempted to deliver the additional 48,000. And I am not going to go through all the telexes. They are in evidence and you can look at them. I think they will be helpful to you.

But Belcher wouldn't cooperate. You can't just pull in with a boat. You need cooperation from the other side.

Finally Apex said to Belcher, look, you take the additional 48,000 barrels or we are going to sell it and then we are going to charge you if there is a difference. If we sell it for less you're going to pay for it. If we sell it for more, no harm, no foul.

Belcher now contends that Judge McLaughlin erred in failing both to give the requested instruction and to exclude the foregoing remarks. In light of our disposition of the appeal, however, we need not address this contention.

including sale by way of one or more contracts to sell or of identification to an existing contract of the seller. Sale may be as a unit or in parcels and at any time and place and on any terms but every aspect of the sale including the method, manner, time, place and terms must be commercially reasonable. *The resale must be reasonably identified as referring to the broken contract,* but it is not necessary that the goods be in existence or that any or all of them have been identified to the contract before the breach.

(3) Where the resale is at private sale the seller must give the buyer reasonable notification of his intention to resell.

*Id.* § 2–706 (emphasis added).

■ Belcher's principal argument on appeal is that the district court erred as a matter of law in allowing Apex to recover resale damages under Section 2–706. Specifically, Belcher contends that the heating oil Apex sold to Gill & Duffus in late March of 1982 was not identified to the broken contract. According to Belcher, the oil identified to the contract was the oil aboard the *Bordeaux*—oil which Apex had sold to Cities Service on the day after the breach. In response, Apex argues that, because heating oil is a fungible commodity, the oil sold to Gill & Duffus was "reasonably identified" to the contract even though it was not the same oil that had been on board the *Bordeaux.* We agree with Apex that, at least with respect to fungible goods, identification for the purposes of a resale transaction does not necessarily require that the resold goods be the exact goods that were rejected or repudiated. Nonetheless, we conclude that as a matter of law the oil sold to Gill & Duffus in March was not reasonably identified to the contract breached on February 11, and that the resale was not commercially reasonable.

■ Resolving the instant dispute requires us to survey various provisions of the Uniform Commercial Code. The first such provision is Section 2–501, which defines "identification" and states in pertinent part:

(1) The buyer obtains a special property and an insurable interest in goods by identification of existing goods as goods to which the contract refers even though the goods so identified are non-conforming and he has an option to return or reject them. Such identification can be made at any time and in any manner explicitly agreed to by the parties. *In the absence of explicit agreement identification occurs*

(a) when the contract is made if it is for the sale of goods already existing and identified;

(b) if the contract is for the sale of future goods other than those described in paragraph (c) [crops and livestock], *when goods are shipped, marked or otherwise designated by the seller as goods to which the contract refers;*

\*     \*     \*     \*     \*     \*

*Id.* § 2–501 (emphasis added). The *Bordeaux* oil was unquestionably identified to the contract under Section 2–501(1)(b), and Apex does not assert otherwise. Nevertheless, Apex argues that Section 2–501 "has no application in the context of the Section 2–706 resale remedy," because Section 2–501 defines identification only for the purpose of establishing the point at which a buyer "obtains a special property and an insurable interest in goods." N.Y.U.C.C. § 2–501. This argument has a facial plausibility but ignores Section 2–103, which contains various definitions, and an index of other definitions, of terms used throughout Article 2 of the Code. With regard to "[i]dentification," Section 2–103(2) provides that the "definition[ ] applying to *this Article*" is set forth in Section 2–501. *Id.* § 2–103 (emphasis added).

Section 2–501 thus informs us that the *Bordeaux* oil was identified to the contract. It does not end our inquiry, however, because it does not exclude as a matter of law the possibility that a seller may identify goods to a contract, but then substitute, for the identified goods, *identical* goods that are then identified to the contract. The Third Circuit recognized such a possibility in *Martin Marietta Corp. v.*

*New Jersey National Bank*, 612 F.2d 745 (3d Cir.1979). In that case, plaintiff Martin Marietta agreed to buy 50,000 tons of sand from Hollander Sand Associates. Martin Marietta subsequently placed signs reading "Property of Martin Marietta" on piles of sand at Hollander's plant. Because Hollander did not object to the signs, the court held that identification had occurred. *Id.* at 749–50. Yet Hollander's creditor argued that the identification had been negated because Hollander had nevertheless sold some of the identified sand to customers other than Marietta. *Id.* at 750. The court rejected this argument, relying upon Official Comment 5 to Section 2–501:

> We feel this argument does not overcome the facts in this case. As already noted: "Undivided shares in an identified fungible bulk ... can be sold. The mere making of a contract with reference to an undivided share in an identified bulk is enough." UCC § 2–501, comment 5. Although this passage deals with goods that exist when the contract is made, it demonstrates that treating fungibles as did Hollander here is consistent with an intent on the part of Hollander to identify or designate the goods. The crux of the passage is that if the seller removes some of the fungibles and later replaces them, that should not undercut the policy favoring identification, probably because such conduct is quite natural with fungibles and cannot be taken as an intent to negate the buyer's interest in the goods. In short, sale and replacement of the sand here does not overcome either the facts or the policy favoring identification.

612 F.2d at 750.

Thus, *Martin Marietta* and Official Comment 5 suggest that, at least where fungible goods are concerned, a seller is not irrevocably bound to an identification once made. However, *Martin Marietta* and Comment 5 were not concerned with resales and thus do not inform us as to what constitutes "reasonable" identification under Section 2–706. The parties nevertheless argue that this issue is resolved by the Code's various provisions governing sellers' remedies. In particular, Belcher relies upon Section 2–706's statement that "the seller may resell the *goods concerned,*" N.Y.U.C.C. § 2–706(1) (emphasis added), and upon Section 2–704, which states that "[a]n aggrieved seller ... may ... identify to the contract conforming goods *not already identified* if at the time he learned of the breach they are in his possession or control." *Id.* § 2–704(1) (emphasis added). According to Belcher, these statements absolutely foreclose the possibility of reidentification for the purpose of a resale. Apex, on the other hand, points to Section 2–706's statement that "it is not necessary that the goods be in existence or that any or all of them have been identified to the contract before the breach." *Id.* § 2–706(2). According to Apex, this language shows that "[t]he relevant inquiry to be made under Section 2–706 is whether the resale transaction is reasonably identified to the breached contract and not whether the goods resold were originally identified to that contract." Apex Br. at 25.

None of the cited provisions are dispositive. First, Section 2–706(1)'s reference to reselling "the goods concerned" is unhelpful because those goods are the goods identified to the contract, but which goods are so identified is the question to be answered in the instant case. Second, as to Section 2–704, the fact that an aggrieved seller may identify goods "not already identified" does not mean that the seller may not identify goods as substitutes for previously identified goods. Rather, Section 2–704 appears to deal simply with the situation described in Section 2–706(2) above, where the goods are not yet in existence or have not yet been identified to the contract. Belcher thus can draw no comfort from either Section 2–704 or Section 2–706(1). Third, at the same time, however, Section 2–706(2)'s reference to nonexistent and nonidentified goods does not mean, as Apex suggests, that the original (prebreach) identification of goods is wholly irrelevant. Rather, the provision regarding nonexistent and nonidentified goods deals with the special circumstances involving anticipatory repudiation by the buyer. *See* N.Y.U.C.C. § 2–706 comment 7. Under such circumstances, there can of course be

no resale remedy unless the seller is allowed to identify goods to the contract after the breach. That is obviously not the case here.

Finding no clear guidance in the language of the Code, we turn to the only decision concerning the identification of fungible goods under Section 2–706, *Servbest Foods, Inc. v. Emessee Industries, Inc.*, 82 Ill.App.3d 662, 37 Ill.Dec. 945, 403 N.E.2d 1 (1980). *Servbest* involved a contract for the sale of meat. Specifically, plaintiff Servbest and defendant Emessee agreed that Servbest would deliver to Emessee 200,000 pounds of fifty-percent lean navel trimmings, an ingredient used in making canned chili. Delivery was to be effected through the transfer of invoices and warehouse receipts. On the appointed day, Servbest delivered the papers to Emessee and physically designated certain navel trimmings in cold storage as reserved for Emessee. Emessee, however, refused to make payment on the contract. Instead it "redelivered" the meat to Servbest on May 3, more than two months after it had been "delivered," (presumably by returning the invoices and receipts) with a letter announcing that it considered the contract and invoices cancelled. *Id.* at 664–65, 37 Ill.Dec. at 948, 403 N.E.2d at 4.

Servbest accordingly brought suit for breach of contract in the Circuit Court for Cook County, Illinois. After a discovery wrangle led the circuit court to strike Emessee's affirmative defenses, the case proceeded to a bench trial on damages. The trial judge held that the navel trimmings were fungible and allowed Servbest to calculate its damages based "upon the first sales after the May 3, 1974 breach, which totalled 200,000 pounds of navel trimmings." *Id.* at 668, 37 Ill.Dec. at 951, 403 N.E.2d at 7. These sales were not, however, from the trimmings identified for Emessee, but rather the meat with the earliest storage expiration date. *Id.* at 667, 37 Ill.Dec. at 950, 403 N.E.2d at 6.

▆ The Appellate Court of Illinois, First District, affirmed. It rejected Emes-

see's argument—identical to that made by Belcher here—that the goods resold under Section 2–706 must be the very goods that were originally identified to the contract. The court noted that the Code must be construed liberally, not mechanically, and that the purpose of the resale remedy is to put the aggrieved seller in the position he would have occupied but for the breach. Based upon these premises and the fact that navel trimmings are fungible, the court concluded that the trial court's resale-damage theory was proper:

> Under Emessee's approach, a sale of any 200,000 pounds of meat from lot 19700 [the lot containing the identified meat] would constitute a proper resale while identical meat from a different lot would be insufficient for that purpose. We do not agree. From our analysis of the record we find no basis upon which to conclude that the market value of the navel trimmings sold from outside of lot 19700 was any different from the market value of the meat contained in lot 19700. Moreover, the nature of fungible goods suggests no reason why, where a contract involving fungible goods is breached by the buyer, a seller could not recover a deficiency award under section 2–706 based upon a resale of goods other than those identified to the contract inasmuch as such a sale would not affect or alter the price received for the goods in either a private or public sale. Accordingly, we hold that the trial court's decision to employ the first sales of navel trimmings after the breach totalling 200,000 [pounds] as a mitigating resale under 2–706 was not erroneous.

*Id.* at 672, 37 Ill.Dec. at 953, 403 N.E.2d at 9. The court also noted that its conclusion was consistent with Section 2–706's statement that aggrieved sellers may resell goods that were not in existence or identified at the time of the breach. *Id.* As Apex asks us to do, the *Servbest* court viewed that statement as "suggest[ing] that identification is not crucial to recovery under 2–706." *Id.*[2]

---

**2.** The *Servbest* court viewed identification under Section 2–501 and identification under Section

2–706 as different concepts, *see* 82 Ill.App.3d at 673–74, 37 Ill.Dec. at 954, 403 N.E.2d at 10, a

In Apex's view, affirmance of its resale-damage award follows *a fortiori* from *Servbest*. Belcher argues primarily that *Servbest* was an "incorrect" and aberrational decision that should not be followed in the name of uniformity. We think, however, that *Servbest* was rightly decided, although we do not agree with much of its reasoning, *see supra* note 2. Nevertheless, our view of the law supports Belcher.

■ We agree with *Servbest* that fungible goods resold pursuant to Section 2–706 must be goods identified to the contract, but need not always be those *originally* identified to the contract. In other words, at least where fungible goods are concerned, identification is not always an irrevocable act and does not foreclose the possibility of substitution. Just as it would have made no sense in *Martin Marietta* to hold that the identified fungibles could not be removed and replaced before breach, here it would make no sense to hold that such replacement (that is, reidentification) can never occur after breach. For example, it serves no purpose of the Code to force an aggrieved seller to segregate goods originally identified to the contract when doing so is more costly than mixing them with other identical goods. To give a concrete example, suppose that Apex had been unable to find someone to take the *Bordeaux* oil immediately after the oil was rejected by Belcher and that the only storage tank available to Apex in Boston was already half-full of No. 2 heating oil. To mix the *Bordeaux* oil with the oil in the only available tank and to identify the first 48,000 gallons sold to the contract is the only sensible thing to do. Doing so, of course, bases the damage award on resales of different oil from that previously identified to the contract. Under a rule that prevents any reidentification of goods to a contract, Apex would be forced in the hypothetical to choose between its resale remedy and a costly diversion of the *Bordeaux*. Yet for the purpose of the resale remedy—which is simply to fix the price of 48,000 barrels of fungible No. 2 oil—resale of any such quantity of conforming oil would do.

Thus, Section 2–706 should not be construed as always proscribing the resale of goods other than those originally identified to the broken contract. Nevertheless, as that Section expressly states, "[t]he resale must be *reasonably* identified as referring to the broken contract," and "every aspect of the sale including the method, manner, time, place and terms must be commercially reasonable." N.Y.U.C.C. § 2–706(2) (emphasis added). Moreover, because the purpose of remedies under the Code is to put "the aggrieved party ... in as good a position as if the other party had fully performed," *id.* § 1–106(1), the reasonableness of the identification and of the resale must be determined by examining whether the market value of, and the price received for, the resold goods "accurately reflects the market value of the goods which are the subject of the contract." *Servbest,* 82 Ill. App.3d at 671, 37 Ill.Dec. at 952, 403 N.E. 2d at 8.

Perhaps the most obvious example of an unreasonable identification and resale would occur when the resold goods and the originally identified goods are not fungible. *Cf. id.* at 672, 37 Ill.Dec. at 953, 403 N.E.2d at 9 (noting that resold meat is "identical in quantity, quality and description" as that in lot originally identified). Another example of an unreasonable identification and resale

view we reject in the text *infra.* The *Servbest* court also rejected Emessee's argument that Section 2–706 "requires the seller to make a contemporaneous identification of the contract of resale to the allegedly broken contract." *Id.* at 673, 37 Ill.Dec. at 954, 403 N.E.2d at 10. Explained the court:

Servbest failed to comply with this requirement, Emessee contends, as illustrated by the fact that it presented four different groups of sales during the course of these proceedings as constituting the mitigating resale of the navel trimmings. Emessee argues that such an approach, if sanctioned by the court, would allow a seller to make several sales after a breach and then pick one of them as complying with section 2–706. We do not agree. Identification of the resale to the broken contract merely requires that the resale consist of goods in conformity to the specifications of the contract.

*Id.* at 673–74, 37 Ill.Dec. at 954, 403 N.E.2d at 10. This ipse dixit, however, defies common sense. *See* 3 W. Hawkland *Uniform Commercial Code Series,* § 2–706:03 (1984).

would be to claim as a resale the sale of goods located where they would have a significantly lower value than the originally identified goods. For example, had Apex purported to identify and resell 48,-000 barrels of No. 2 oil contained in a storage tank in the Virgin Islands, where heating oil is presumably less useful and valuable than in Boston, while simultaneously delivering the same amount to Cities Service in Boston, the identification and resale would be unreasonable.

■ The most pertinent aspect of reasonableness with regard to identification and resale involves timing. As one treatise explains:

> [T]he object of the resale is simply to determine exactly the seller's damages. These damages are the difference between the contract price and the market price at the time and place when performance should have been made by the buyer. The object of the resale ... is to determine what the market price in fact was. *Unless the resale is made at about the time when performance was due it will be of slight probative value, especially if the goods are of a kind which fluctuate rapidly in value.* If no reasonable market existed at this time, no doubt a delay may be proper and a subsequent sale may furnish the best test, though confessedly not a perfectly exact one, of the seller's damage.

4 R. Anderson, *Anderson on the Uniform Commercial Code* § 2–706:25 (3d ed. 1983); *see also Servbest*, 82 Ill.App.3d at 671, 37 Ill.Dec. at 952, 403 N.E.2d at 8. The issue of delay between breach and resale has previously been addressed only in the context of determining commercial reasonableness where the goods resold are the goods originally identified to the broken contract. However, the principles announced in that context apply here as well:

> What is ... a reasonable time [for resale] depends upon the nature of the goods, the condition of the market and other circumstances of the case; its length cannot be measured by any legal yardstick or divided into degrees. Where a seller contemplating resale re-ceives a demand from the buyer for inspection under the section of [sic] preserving evidence of goods in dispute, the time for resale may be appropriately lengthened.

N.Y.U.C.C. § 2–706 comment 5; *accord Bache & Co. v. International Controls Corp.*, 339 F.Supp. 341, 351 (S.D.N.Y.), *aff'd per curiam*, 469 F.2d 696 (2d Cir. 1972) (affirming on basis of district court opinion).

■ Here, Apex's delay of nearly six weeks between the breach on February 11, 1982 and the purported resale on March 23 was clearly unreasonable, even if the transfer to Cities Service had not occurred. Steven Wirkus, of Apex, testified on cross-examination that the market price for No. 2 heating oil on February 12, when the *Bordeaux* oil was delivered to Cities Service, was "[p]robably somewhere around 88 cents a gallon or 87." (The EFP contract price, of course, was 89.70 cents per gallon.) Wirkus also testified on redirect examination that the market price fluctuated throughout the next several weeks:

Q. Sir, while you couldn't remember with particularity what the price of oil was on a given day four years ago, is it fair to say that prices went up and down?

A. Definitely that's fair to say.

Q. From day-to-day?

A. Yes.

Q. Towards the end of February prices went down?

A. That's correct.

Q. Then in early March it went back up?

A. In early March, yes.

Q. Then they went back down again towards the middle of March; isn't that correct?

MR. GILBERT: I object to the form of this, your Honor, on redirect.

THE COURT: Yes.

Q. Did they go back down in mid March, Mr. Wirkus?

A. My recollection, yes.

Q. In late March what happened to the price?

A. Market went back up.

Moreover, Wirkus testified that, on March 23, in a transaction unrelated to the resale, Apex purchased 25,000 barrels of No. 2 oil for March delivery at 80.50 cents per gallon, and sold an equivalent amount for April delivery at 77.25 cents per gallon. Other sales on March 22 and 23 for April delivery brought similar prices: 100,000 barrels were sold at 76.85 cents, and 25,000 barrels at 76.35 cents. The Gill & Duffus resale, which was also for *April* delivery, fetched a price of 76.25 cents per gallon— some eleven or twelve cents below the market price on the day of the breach.

In view of the long delay and the apparent volatility of the market for No. 2 oil, the purported resale failed to meet the requirements of Section 2–706 as a matter of law. The delay unquestionably prevented the resale from "accurately reflect[ing] the market value of the goods." *Servbest,* 82 Ill.App.3d at 671, 37 Ill.Dec. at 952, 403 N.E.2d at 8. Indeed, in the analogous context of the securities markets (which are arguably not much more liquid or volatile than today's centralized and computerized commodities markets), we have upheld a district court's conclusion that thirty days was a maximum time for the commercially-reasonable resale of securities after the breach of a tender offer. *Bache & Co. v. International Controls Corp.,* 339 F.Supp. at 352, *aff'd per curiam,* 469 F.2d 696. In *Bache,* moreover, the plaintiff was a securities broker suing on behalf of its customers, and the district court considered "the distribution around the country" of those customers when it set the thirty-day limit on commercially-reasonable resales. *Id.* In the instant case, of course, the oil was Apex's, and Apex's alone.

Nor do we find Apex's delay justified on any other ground. Apex does not assert, for example, that "the time for resale [should] be appropriately lengthened" because Belcher sought an "inspection ... [to] preserv[e] evidence of [the] goods in dispute," N.Y.U.C.C. § 2–706 comment 5; Belcher of course made no such request,

and Apex immediately disposed of the *Bordeaux* oil in any event. Apex's only asserted justification, which the district court accepted in denying Belcher's motion for judgment notwithstanding the verdict, was that the delay was caused by continuing negotiations with Belcher. We find that ruling to be inconsistent with the district court's view that Belcher's breach, if any, occurred on February 11. The function of a resale was to put Apex in the position it would have been on that date by determining the value of the oil Belcher refused. The value of the oil at a later date is irrelevant because Apex was in no way obligated by the contract or by the Uniform Commercial Code to reserve 48,000 gallons for Belcher after the February 11 breach. Indeed, that is why Apex's original theory, rejected by the district court and not before us on this appeal, was that the breach occurred in March.

■■ The rule that a "resale should be made as soon as practicable after ... breach," *Bache,* 339 F.Supp. at 352, should be stringently applied where, as here, the resold goods are not those originally identified to the contract. In such circumstances, of course, there is a significant risk that the seller, who may perhaps have already disposed of the original goods without suffering any loss, has identified new goods for resale in order to minimize the resale price and thus to maximize damages. That was not the case in *Servbest,* for example, where the resale consisted of the first sales made after the breach. *See* 82 Ill.App.3d at 675, 37 Ill.Dec. at 955, 403 N.E.2d at 11. Here, by contrast, the oil originally identified to the contract was sold [3] the day after the February 11, 1982 breach, and no doubt Apex sold ample amounts thereafter in the six weeks before the purported resale. We note that in its complaint and throughout the trial Apex asserted that it was suing on a breach that occurred as late as three days before the resale. This is not surprising given *Servbest,* the length of Apex's

---

**3.** Apex contends that the 48,000 *Bordeaux* barrels were not "sold" to Cities Service because the oil was exchanged not for cash but instead for oil to be delivered at a subsequent time. How-

ever, "[a] 'sale' consists in the passing of title from the seller to the buyer for a price," N.Y.U.C.C. § 2–106, a price being "payable in money or otherwise." *Id.* § 2–304 (emphasis added).

delay, and the drop in the market price for No. 2 oil. But, as noted, the district court held, in a ruling not appealed from, that the only viable theory available to Apex was that involving a breach on February 11. Because the sale of the oil identified to the contract to Cities Service on the next day fixed the value of the goods refused as a matter of law, the judgment on the breach-of-contract claim must be reversed.

■ We turn finally to Apex's fraud claim. Under New York law, a plaintiff claiming fraud must prove, by clear and convincing evidence,

(1) that the defendant made a misrepresentation, (2) as to a material fact, (3) which was ·false, (4) and known to be false by the defendant, (5) that the representation was made for the purpose of inducing the other party to rely upon it, (6) that the other party rightfully did so rely, (7) in ignorance of its falsity (8) to his injury.

*Computerized Radiological Servs. v. Syntex Corp.*, 786 F.2d 72, 76 (2d Cir.1986) (quoting *Brown v. Lockwood*, 76 A.D.2d 721, 730, 432 N.Y.S.2d 186, 193 (2d Dep't 1980)). Belcher claims that the evidence was insufficient to support the jury's finding that Apex, in agreeing to the settlement with Belcher, had relied upon Belcher's misrepresentations in ignorance of their falsity and had suffered injury accordingly.

In support of the finding of reliance, Apex relies primarily, if not exclusively, upon the testimony of its president, Anthony Novelly. Novelly testified that he had delegated the task of negotiation to in-house counsel, Harold Lessner. Lessner nevertheless kept Novelly abreast of Belcher's various demands and representations because it was Novelly, as president, "who had to approve the settlement ultimately." To this effect, Novelly testified as follows:

Q. During your discussion with Mr. Lesner [sic], did he say anything to you concerning whether Belcher had used the oil?

A. No, he said the oil was off spec and not useable.

Q. He said that is what Belcher had told him?

A. Correct.

Q. During your conversation with Mr. Lesner [sic], did he tell you anything about whether Belcher was claiming damages, as a result of the delivery?

A. Yes, they were.

Q. And did you rely on all the matters that were conveyed to you in approving the settlement?

A. Yes, I did.

According to Apex, this testimony regarding its alleged reliance is "unrebutted." That may be true so far as other witnesses are concerned, but Novelly candidly modified his testimony on cross-examination as follows:

Q. At the time you approved the settlement, one of the terms was that Belcher was going to get a discount off the agreed price for the BORDEAUX oil of two and a half cents per gallon, is that correct?

A. Yes.

Q. Did you believe they were intitled [sic] to a two and a half cent per gallon discount based on the facts you know?

MR. WEINER: Objection.

THE COURT: Overruled.

A. Not really.

Q. You did not believe that?

A. No.

Q. Did you believe they were intitled [sic] to any discount?

A. I wouldn't have thought so.

Q. You agreed to the settlement for other reasons, did you not?

A. I agreed to the settlement to get the thing settled.

Q. You wanted to get it behind you, is that correct?

A. Yes.

Q. You had a number of items—

A. Whole bunch of them.

Q. You didn't like to leave all these open items?

A. I didn't want a mess hanging around.

Q. You wanted to get everything cleaned up?

A. That's correct.

Q. You had another idea—withdrawn.

You had another motivation, didn't you sir?

A.   Coastal [Belcher's parent] was a big company, I don't like to have problems with big companies.   I try to settle things and avoid litigation.

Q.   You want to get all the open items closed, for you to do business with Coastal and its subsidiaries, is that correct?

A.   That is a good statement, yes.

\*     \*     \*     \*     \*     \*

Q.   At the time you were discussing the settlement with Mr. Lesner [sic] or anybody else you talked about it with, did you have the belief that the oil delivered to Belcher aboard the BORDEAUX was in fact not useable by Belcher?

A.   I never had that belief, no.

However much this display of refreshing candor ought to be rewarded, we must conclude that, in light of the concessions that Novelly was seeking a compromise of all outstanding disputes and did not believe Belcher's misrepresentations as to the oil delivered on February 11, a reasonable jury could not find by clear and convincing evidence that Apex believed and relied upon Belcher's misrepresentations.

Reversed.