**COMMONWEALTH EDISON COMPANY, Plaintiff,**

v.

**DECKER COAL COMPANY, Defendant.**

No. 84 C 9573.

United States District Court, N.D. Illinois, E.D.

Feb. 13, 1987.

A. Daniel Feldman, Pamela B. Strobel, James K. Meguerian, Isham, Lincoln & Beale, Chicago, Ill., for plaintiff.

Stephen R. Patton, Miriam G. Bahcall, Kirkland & Ellis, Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

MORAN, District Judge.

This case seems to bump along in six-month increments. On July 2, 1985 this court denied plaintiff's motion for judgment on the pleadings, noting that it was far from clear that Decker Coal Company (Decker) had repudiated two contracts (612 F.Supp. 978). That opinion deferred consideration of Decker's motion for summary judgment in view of plaintiff's representation that it wished to present additional evidence. It did so, and on January 8, 1986 this court granted defendant's motion for summary judgment on plaintiff's claim and on defendant's counterclaim. That left open the issue of damages and, about six months later, this court conducted an evidentiary hearing. And, now, after another six months, this court is prepared to rule.

■ Some of the delay has been due to Commonwealth Edison Co.'s (Edison) shifting its ground, first at the hearing and then by a subsequent motion for reconsideration. The motion for reconsideration raises two contentions. The first is that the contract is really a contract for the sale of an interest in unsevered minerals and therefore not subject to the Uniform Commercial Code as the parties had previously assumed and, indeed, had agreed to be so as an uncontested fact. The contention is not well grounded. The test under UCC § 2–107(1) as to whether an interest in minerals is a contract for the sale of goods is whether the contract calls for severance by the seller. While the Coal Lease Agreement uses the language of an interest in land, by the terms of the accompanying Coal Mining Agreement (¶¶ 1(a), 1(g)) Decker has the exclusive right to do Edison's mining for it. In other words, Edison can only exercise its right to sever the coal through the seller, Decker. Thus the transaction as a whole falls squarely within § 2–107(1). Even if that were not so, however, plaintiff does not suggest how the difference would impact the doctrine of anticipatory repudiation and this court is not aware of any such impact.

Further, Edison contends that there may be more to the story due to Decker's conduct during the course of the relationship. It seeks to parlay an affidavit reference to the state of mind of one of its officials to a hitherto undeveloped exposition of conduct by Decker which supposedly led to that state of mind. The argument appears to be that such a course of conduct could lead to a reasonable belief by Edison that Decker had clearly determined not to perform. But this court deferred ruling on Decker's summary judgment motion initially in an opinion which emphasized that it was Decker's conduct which was the focus of any determination of repudiation. 612 F.Supp. at 981–982. Given the opportunity, Edison chose not to present additional evidence on that. That choice was specifically discussed in the January 8, 1986 Memorandum and Order, and it is too late for Edison to try again. See, e.g., Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1112 (7th Cir.1984), cert. denied, 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985); Egger v. Phillips, 710 F.2d 292, 329 (7th Cir.), cert. denied, 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983). The motion for reconsideration is denied.

How the parties structured the relationship is of some relevance. They entered into two contracts as of June 4, 1982. In one, the Coal Lease Purchase Agreement, Edison agreed to purchase undivided fractional interests in certain Decker interests in coal leases. The purchases were to be on five dates, two in the summer of 1982 and the other three on the successive dates of July 1, 1983, July 1, 1984 and July 1, 1985. Each interest sold was the right to mine and remove specific quantities of coal (Reserve Coal) at specified prices as adjusted. That contract specified the manner and time of payment for each purchase,

with a late payment charge of prime plus four per cent. The interests were subject and subordinate to the terms and conditions of the second agreement.

The second agreement, entered into as of the same date, was a Coal Mining Agreement. That contract provided that Decker would mine and remove the Reserve Coal at Edison's request, the cost of that service being specified in the contract. The agreement set forth the maximum amount to be mined and removed each year for five years commencing in 1986 and ending in 1990, each maximum corresponding to one of the interests purchased by the other agreement. The Coal Mining Agreement also contained provisions for accelerating and deferring deliveries and required Edison to accelerate payments for the interest in Reserve Coal if it accelerated delivery of that coal. If Edison failed to exercise a delivery option, that option lapsed, and Edison lost its right to have that coal mined and removed.

The effect of the two agreements was to impose an unconditional duty upon Edison to pay for the undivided interests at some time, absent repudiation by Decker or some other reason for relief, although the timing of payments could be somewhat changed. Edison had an option not to have the coal mined or removed and it could assign its mining and removal rights. If it did neither it would, in due course, lose its interest in the affected Reserve Coal. In short, it obligated itself to pay for coal in the ground but not for its extraction; but if it did not choose to have the coal extracted, it would lose what it had obligated itself to pay for securing the coal interests.

This case arises out of unanticipated changes in market conditions. This court surmises that Edison entered into the arrangements to safeguard an adequate supply of low sulphur coal. Over time, however, alternate energy sources became comparatively far more economical. Edison had purchased coal reserves which it did not need and which it did not want mined, and it did not want to pay for them. For a discussion of a somewhat similar dispute

see *Northern Indiana Public Service Company v. Carbon County Coal Company*, 799 F.2d 265 (7th Cir.1986). However, Edison is obligated to pay for them, as this court found in January 1986. The dispute which remains concerns how much it has to pay and what it gets in return.

The parties are agreed that the contract price for the 1990 Reserve Coal (for the purposes of this motion) is $5,497,291.81. Thus, if Edison had performed it would have paid that amount and would have owned an interest in the coal deposits. But it did not perform. The question is what remedy Decker has for that non-performance. The parties also agree that there is no market for those coal reserves. That is, the coal reserves have a zero value in the present market because the cost of mining and removing the coal exceeds any possible sale price for it. Since the coal reserves are identified to the contract and cannot be resold, the situation would appear to call for the application of § 2–709(1)(a), awarding Decker the contract price as its remedy. Decker, however, maintains that it can freely select its remedy under the UCC and has chosen to characterize its suit as one for "lost profits" under § 2–708(2).

So characterized, Decker says that the "lost profits" are, of course, the same $5,497,291.81, since the credit for resale is $0.00 (though, in fact, it has introduced no formal evidence breaking the figure down into its costs of acquisition, its overhead and its expected profit, as is normally required in a § 2–708(2) suit). However, the "lost profit" remedy normally does not include a consideration of who gets the goods, whereas in an action for the price the goods are ordinarily held for the buyer if he wants them. § 2–709(2). By using § 2–708(2), Decker thus believes it can recover the full contract price and still keep its interest in the coal. It also wants prejudgment interest at the rate of interest for late payment set in the contract, prime plus 4%.

Edison does not directly challenge the characterization of Decker's suit as a "lost profits" action, but it does argue that

Decker asks for too much. If Edison has to pay Decker the full contract price, then Edison feels it ought to get the interest in the coal contemplated under the contract, a right to have the coal mined at its option any time between now and 1990 (after which the interest, if not exercised, reverts to Decker under ¶ 1(g) of the mining agreement). If, on the other hand, a "lost profits" action lets Decker keep the coal, then at the very least Decker ought not to get prejudgment interest, at the contract rate or otherwise. Since such interest is awardable only when damages are liquidated, and lost profits ordinarily are not determinable with such precision as to be considered liquidated, if Decker has chosen the lost profits theory it has chosen to forego prejudgment interest. Decker counters by pointing out that, in this case, the damages are liquidated.

██ On reflection, this court thinks the flaw lies with Decker's assumption that as a wronged seller it can freely choose whichever remedy offers the largest possible recovery. Rather, the UCC's remedial scheme for sellers establishes something of a hierarchy of remedies tied to particular frequently recurring fact patterns. In a given case, one is ordinarily obligated to use the remedy which best fits the facts of that case and which produces a result which is in line with the broad remedial goals of the UCC: that the aggrieved party be put in as good a position as if the other party had fully performed, but no better. *Nobs Chemical, U.S.A., Inc. v. Koppers Co.*, 616 F.2d 212, 215 (5th Cir.1980) (jobber limited to action under § 2–708(2) although § 2–708(1) would have yielded a substantially larger recovery); *Kelly v. Miller*, 575 P.2d 1221 (Alaska 1978) (seller qualified to bring § 2–709 action not entitled to use self-help remedy). *See* UCC § 1–106(1) and comment 1; Childres & Burgess, *Seller's Remedies: The Primacy of UCC § 2–708(2)*, 48 N.Y.U.L.Rev. 833, 863–864 (1973). In the instant case, those considerations mean that Decker is limited to the recovery available under § 2–709, the action for the price.

We have found no case which squarely presents the question of whether a seller qualified to recover the contract price under § 2–709 can nevertheless seek a larger recovery under § 2–708(2). (Ordinarily the contract price represents the maximum a seller could receive, so ordinarily he is delighted to recover it in the comparatively few situations in which an action for the price is available). However, several considerations support a conclusion that the seller cannot. The statutory language itself rather strongly suggests that § 2–708 remedies are available only to a seller who is not entitled to the contract price. § 2–709(3) and comment 7; *see* Childres & Burgess, *supra*, at 864. Case law on the relationship between these two sections consistently treats the remedies under § 2–708 as a seller's "fallback" position: first the court determines if the facts fit the contours of the action for the price, and only if they do not does the court look at the § 2–708 alternatives. *See Zippy Mart of Alabama, Inc. v. A & B Coffee Service, Inc.*, 380 So.2d 833, 835 (Ala.1980); *Wolpert v. Foster*, 312 Minn. 526, 254 N.W.2d 348, 351 (1977); *Cesco Manufacturing Corp. v. Norcross, Inc.*, 7 Mass.App. 837, 391 N.E.2d 270, 274 (1979); *Detroit Power Screwdriver Co. v. Ladney*, 25 Mich.App. 478, 181 N.W.2d 828, 832 (1970).

Moreover, the § 2–708(2) remedy is written to be limited in scope. Many courts, following what is known about situations the authors had in mind when drafting that section, limit its application to volume sellers, jobbers and the like. *See, e.g., TCP Industries, Inc. v. Uniroyal, Inc.*, 661 F.2d 542, 552 (6th Cir.1981); *Lake Erie Boat Sales, Inc. v. Johnson*, 11 Ohio App.3d 55, 463 N.E.2d 70, 72 (1983). But even the two commentators who think that § 2–708(2) ought to be treated as the principal seller's remedy in the UCC would not apply it when the facts support an action for the price. *Childres & Burgess, supra*, at 865–866. By its own language, it applies only when the remedy of § 2–708(1) "is inadequate to put the seller in as good a position as performance would have done." It takes little extension of that statutory lan-

guage, particularly when read with § 2–709(3)'s implied hierarchy of remedies, to conclude that the drafters also did not intend it to apply when one of the other remedies would put the seller in as good a position as performance would have done. The remedial policy of the entire UCC seeks no more than that. Decker has spoken of the need to "punish" Edison, but the UCC specifically rejects damages which would punish the breaching party except in the most egregious circumstances. § 1–106(1) and comment 1. Decker is entitled to the benefit of its bargain, but not more.

■ Against all of these considerations, only the ambiguous statement in § 2–703 comment 1 that "the remedies are essentially cumulative in nature" lends any support to the idea that a seller who can get the full benefit of his bargain under § 2–709 can seek even more under § 2–708(2). We do not read that comment as authorizing a windfall. *Cf.* § 1–102(1) and comment 1 (UCC should be construed in accordance with its underlying purposes and policies); *Nobs,* 616 F.2d at 215; *Melby v. Hawkins Pontiac, Inc.,* 13 Wash.App. 745, 537 P.2d 807, 811 (1975). Decker's recovery is limited to whatever would be available to it in an action on the price.

■ With the action properly characterized, the rest of the disputes are easily resolved. Decker gets the contract price under § 2–709(1)(b); under § 2–709(2) Edison, once it has paid the judgment, gets the right (until 1990) to mine the reserve coal. *Unlaub Co., Inc. v. Sexton,* 568 F.2d 72, 77 n. 5 (8th Cir.1977); *Wolpert,* 254 N.W.2d at 350; *FMI, Inc. v. RMax, Inc.,* 286 S.C. 343, 333 S.E.2d 360, 362 (S.C.App.1985). In an action for the price, the seller is entitled to its damages from its loss of the use of the money it would have had if the buyer had paid on time—i.e., some level of prejudgment interest—as incidental damages resulting from the breach. §§ 2–709(1), 2–710; *Bulk Oil Co. (U.S.A.) Inc. v. Sun Oil Trading Co.,* 697 F.2d 481, 484–485 (2d Cir.1983); *Klockner, Inc. v. Federal Wire Mill Corp.,* 663 F.2d 1370, 1380 (7th Cir. 1981). We see no reason not to consider the contract rate of interest as the parties' liquidation of those damages under § 2–718(1).

■ The parties, leaving no stone unturned, present one further question: whether post-judgment interest in this diversity case is governed by the new federal interest statute, 28 U.S.C. § 1961, or by the Illinois statutory rate of interest as it was before that statute was passed in 1982. Three circuits have taken the position that the question is at least as much procedural as it is substantive, that use of the federal statute is not likely to encourage forum shopping since the rate varies unpredictably, and so that the federal statute should be used. *Roy Stone Transfer Corp. v. Budd Co.,* 796 F.2d 720, 723 n. 6 (4th Cir.1986); *G.M. Brod & Co. v. U.S. Home Corp.,* 759 F.2d 1526, 1542 (11th Cir.1985); *Weitz Co. v. Mo-Kan Carpet, Inc.,* 723 F.2d 1382, 1386 (8th Cir.1983). One circuit may have taken the opposite stance, although from the opinion's language it is just as likely that neither party raised the issue. *Davis & Cox v. Summa Corp.,* 751 F.2d 1507, 1522 (9th Cir.1985); *see also Lazzara v. Esser,* 622 F.Supp. 48 (N.D.Ill. 1985). Since the Seventh Circuit has held that federal common law applies to a somewhat analogous question, the standard which a district court sitting in diversity should apply in determining whether a jury award is excessive, *In re Air Crash Disaster Near Chicago,* 803 F.2d 304, 318 n. 12 (7th Cir.1986), we think that this circuit will side with the majority and apply the federal statute. Post-judgment interest here will be governed by 28 U.S.C. § 1961.

In summary, defendant-counterplaintiff is awarded the contract price, $5,497,291.81 plus interest at the prime rate plus 4% from July 1st, 1985 to the date of this judgment, pursuant to ¶ 3 of the Coal Lease Purchase Agreement. Post-judgment interest shall be at the rate set by 28 U.S.C. § 1961. Plaintiff-counterdefendant is entitled, upon satisfaction of the judgment, to an undivided fractional interest consisting of the right to mine 462,000 tons of 1990 reserve coal pursuant to ¶ 1 of the

846

Coal Lease Purchase Agreement and ¶ 1 of the Coal Mining Agreement.