**FIRWOOD MANUFACTURING COMPANY, INC., Plaintiff–Appellee,**

v.

**GENERAL TIRE, INC., Defendant–Appellant.**

No. 95–1969.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 8, 1996.

Decided Sept. 16, 1996.

Stephen D. Winter (argued), Zora E. Johnson (briefed), Dykema & Gossett, Detroit, MI, for Plaintiff–Appellee.

Stephen F. Wasinger, Daniel G. Helton (argued and briefed), Honigman, Miller, Schwartz & Cohn, Detroit, MI, for Defendant–Appellant.

Before: KENNEDY, WELLFORD, and SILER, Circuit Judges.

KENNEDY, J., delivered the opinion of the court, in which SILER, J., joined. WELLFORD, J., (pp. 173–174), delivered a separate opinion concurring in part and dissenting in part.

KENNEDY, Circuit Judge.

Defendant General Tire, Inc. appeals the District Court's denial of its motions for judgment as a matter of law, a new trial, and remittitur following a jury verdict in this diversity action awarding plaintiff Firwood Manufacturing Company, Inc. $187,513 in resale damages and $100,476 in interest in this breach of contract dispute. General Tire argues that it was entitled to judgment as a matter of law because Firwood did not prove its damages under Mich. Comp. Laws Ann. § 440.2706 (West 1994); that the District Court should have granted a new trial because the jury was given an erroneous and prejudicial instruction regarding contract formation; and that it was entitled to remittitur of the interest portion of damages because sellers are entitled to receive incidental, but not consequential, damages and interest is a consequential damage. For the following reasons, we **AFFIRM** the liability award but **REVERSE** the award of interest.

**I**

This dispute arises from a contract between Firwood and General Tire in which General Tire allegedly agreed to purchase fifty-five model 1225 post-cure inflators (PCIs), thirty-thousand dollar machines used by General Tire in its manufacturing process.

Following lengthy negotiations between representatives from each company, on October 9, 1989 Firwood transmitted the following offer letter:

Quantity pricing based on a minimum of (55) units to be purchased through 1990 will apply initially. Should General not purchase at least (55) units by December 31, 1990, pricing will revert to the exact quantity purchased per the attached price schedule. If this be the case, Firwood will submit a corrected invoice no later than January 15, 1991 for the difference in price based on actual quantity purchased.

For quantities beyond 1990 we suggest using a mutually agreeable index for capital equipment alongwith verified labor increase to establish 1991 price levels.

[ ]

After your review of this letter we would appreciate receiving your letter of intent outlining your agreement with the above and your anticipated purchase dates for the remaining units.

Firwood's manufacturer's representative, Thomas Kane, testified that this document was Firwood's offer to manufacture a minimum of fifty-five PCIs for General Tire. Additionally, Kane testified, this October 9 letter was not just a price schedule under which Firwood agreed to manufacture whatever number of PCIs General purchased, at pricing levels that depended on the quantity ordered.

Kane testified that he personally delivered the offer letter to James Headley, General Tire's Senior Buyer, on October 9 and that Headley orally agreed to purchase fifty-five units and promised to send the requested letter of intent to confirm General Tire's acceptance. On October 10, General Tire issued two written purchase orders to Firwood in which it revised prior orders to reflect the new price of $31,216 per PCI—the

price level available for purchases of a minimum of fifty-five units—and encouraged Firwood to have all fifty-five PCIs available for delivery.

On the strength of Headley's oral agreement and General Tire's new purchase orders reflecting the fifty-five unit price, Firwood began ordering parts for the PCIs. Between November 1989 and April 1990, General Tire released sixteen additional purchase orders that reflected the fifty-five minimum purchase price of $31,216.

In February 1990, James Headley, General Tire's Senior Buyer, sent Firwood the letter of intent sought in the October 9 offer letter. Headley wrote:

> This letter will serve as our intent to purchase approximately fifty five (55) Firwood [sic] Model 1225 Post Cure Inflators over the next fifteen months.
>
> We have purchased six units on our orders TF 25942 and TF 25943. The balance will be ordered during 1990 approximately as follows:
>
> | Mayfield | 22 | 3rd Quarter |
> |----------|----|-----------|
> | Barrie | 21 | 1st Quarter |
> | Charlotte | 6 | 1st Quarter |
>
> The conditions of pricing will be as outlined in your letter of October 9, 1989.

In March 1990, Kane wrote to Headley to confirm Firwood's agreement to change from Schrader–Bellows valves to MacValves on the twenty-one PCIs destined for the Barrie plant in the first quarter of 1990, on two conditions: that Firwood be allowed to use Schrader valves on the twenty-two PCIs destined for the Mayfield plant and that General Tire pay an additional $150 per unit for the Barrie PCIs.

By April 1990, General Tire had purchased twenty-two PCIs from Firwood under the contract. General Tire closed its Barrie plant soon thereafter.

On April 11, 1991, Firwood wrote General Tire to remind it of its obligation to purchase fifty-five PCIs. Firwood informed General Tire that the thirty-three remaining PCIs were in the following stages of production: eight units, 100 percent complete; five units, 95 percent complete; and twenty units, 65 percent complete.

After learning that General Tire did not intend to complete the purchase of the remaining thirty-three PCIs at issue in this dispute, Firwood began looking for alternative buyers. Firwood contacted every major tire company in the United States. General Tire also sought alternative buyers for the PCIs. After three years of searching for alternative buyers, during which it sold a few machines, Firwood was ultimately able to sell the balance of the thirty-three PCIs intended for General Tire, but at a price below that called for in the contract with General Tire.

While looking for buyers, Firwood filled some of its ongoing orders for spare parts with parts that already had been installed in the thirty-three PCIs intended for General Tire. Although the PCIs themselves were specially made for General Tire, the parts taken from the General Tire PCIs and sold as spare parts were fungible parts regularly sold in Firwood's spare parts business.

Following a jury trial, the jury awarded Firwood $287,989 in damages, of which $187,513 represented the difference between resale price and contract price, and $100,476 represented interest. Following trial, General Tire filed a motion seeking judgment as a matter of law, a new trial, or remittitur. The District Court denied General Tire's post-trial motions, and this appeal followed.

## II

General Tire offers three arguments on appeal: that the District Court erred in denying its motion for a new trial when a jury instruction erroneously allowed the jury to conclude that General Tire's February letter of intent constituted its acceptance of Firwood's offer; that Firwood did not prove its damages under § 2706 of the U.C.C. when the replacement PCIs it resold contained parts not identified to the contract at the time of the breach and when the resales occurred three years after the breach; and that Firwood is not entitled to interest as an element of its damages because interest is a consequential damage and the U.C.C. allows sellers to recover incidental, but not consequential, damages.

## A

General Tire first argues that the District Court erred in denying its motion for a new trial. General Tire argues that the Court's jury instruction on contract formation, which allowed the jury to find that General Tire's February 28, 1990 letter of intent constituted its acceptance of Firwood's October 9, 1989 offer, was erroneous and prejudicial because all parties agree that General accepted Firwood's offer orally on October 9. General Tire argues that since its February letter of intent adds new terms to the already orally accepted contract, those new terms do not become part of their contractual obligations. More specifically, General Tire claims that the October 9 offer did not entail a guaranteed minimum purchase of fifty-five PCIs; rather, it simply offered a sliding-scale price guide for different quantities. Since General accepted the October 9 offer orally that same day, General was only agreeing to abide by the price schedule, not a minimum purchase of fifty-five units. Therefore, to the extent its February letter of intent did agree to commit General to purchase fifty-five PCIs— a proposition General Tire strongly contests—it was invalid under Michigan case law that prevents parties from engaging in a battle of forms with differing terms following an oral agreement.

We review the District Court's denial of General Tire's motion for a new trial for abuse of discretion. *Francis v. Clark Equip. Co.,* 993 F.2d 545, 552 (6th Cir.1993). "A party is not entitled to a new trial based upon alleged deficiencies in the jury instructions unless the instructions, taken as a whole, are misleading or give an inadequate understanding of the law." *Bowman v. Koch Transfer Co.,* 862 F.2d 1257, 1263 (6th Cir. 1988).

▪ The District Court gave the jury the following instruction:

Members of the jury, unless otherwise unambiguously indicated by the language of [sic] circumstances, an offer to make a contract is to be construed as one which invites acceptance in any manner and by any medium reasonable in the circumstances. An offer may be accepted and a contract formed by means of a letter of intent, even if an acceptance—even if the acceptance states terms additional to or different from those offered or agreed upon, it is sufficient toconstitute an acceptance under the law, unless acceptance is expressly made conditional on assent to the additional or different terms.

Here, even if our analysis only focused on this particular instruction, rather than on the instructions as a whole, the instruction does not give a misleading or inadequate understanding of the law. It does not tell the jury that they must find that General Tire accepted the October 9 offer through the letter of intent; it merely allows the jury to find that General Tire's letter of intent constituted the acceptance called for in the offer letter.

Firwood presented evidence to support this theory. In his October 9 offer, Thomas Kane wrote "[a]fter your review of this letter we would appreciate receiving your letter of intent outlining your agreement with the above and your anticipated purchase dates for the remaining units." Thus, the offer letter specifically contemplated that acceptance would take place via a letter of intent. Moreover, Kane testified that the October 9 offer letter contemplated a minimum purchase by General Tire of fifty-five PCIs and that the offer requested acceptance by a letter of intent; thus, the February letter did not add new terms because, Kane testified, General Tire had already agreed to purchase a minimum of fifty-five PCIs.

Since the instruction simply allowed the jury to find that the letter of intent accepted the October 9 offer and thereby bound General Tire to purchase fifty-five units, it was neither erroneous nor prejudicial. Though neither the offer nor the letter of intent is a model of clarity or precision, a jury could find that they constituted, respectively, offer and acceptance or confirmation of the oral acceptance.

## B

General Tire also argues that the District Court erred in denying its motion for judgment as a matter of law when Firwood did not prove its damages under Mich. Comp.

Laws Ann. § 440.2706 (West 1994). That section allows sellers to receive the difference between contract price and resale price, plus incidental expenses, when a buyer breaches:

> (1) Under the conditions stated in section 2703 on seller's remedies, the seller may resell the goods concerned or the undelivered balance thereof. Where the resale is made in good faith and in a commercially reasonable manner the seller may recover the difference between the resale price and the contract price together with any incidental damages allowed under the provisions of this article (section 2710), but less expenses saved in consequence of the buyer's breach.
>
> (2) Except as otherwise provided in subsection (3) or unless otherwise agreed resale may be at public or private sale including sale by way of one or more contracts to sell or of identification to an existing contract of the seller. Sale may be as a unit or in parcels and at any time and place and on any terms but every aspect of the sale including the method, manner, time, place and terms must be commercially reasonable. The resale must be reasonably identified as referring to the broken contract, but it is not necessary that the goods be in existence or that any or all of them have been identified to the contract before the breach.

Mich. Comp. Laws Ann. § 440.2706(1),(2) (West 1994) (footnote omitted). General Tire argues that Firwood cannot recover under § 440.2706 because it did not comply with this section's requirements. General Tire argues that Firwood did not reasonably identify the goods under the contract because the thirty-three PCIs ultimately sold contained parts not originally included in the machines at the time of the breach. There is also a question whether the resale was commercially reasonable where twenty-nine of the thirty-three machines were sold three years after the breach.

We must first decide whether a seller may substitute fungible goods for those identified to the contract at the time of the breach. Here, identical parts were used to replace the parts which had been sold in the interim. On this question, we find persuasive the reasoning of those courts that allow sellers to substitute fungible goods for purposes of resale so long as the goods truly are fungible and the resale itself is commercially reasonable. In *Servbest Foods, Inc. v. Emessee Indus., Inc.*, 82 Ill.App.3d 662, 37 Ill. Dec. 945, 403 N.E.2d 1 (1980), the Court allowed a seller to recover damages under § 2706 of the U.C.C. when the resale included different meat than that specifically identified to the contract at the time of the breach:

> the nature of fungible goods suggests no reason why, where a contract involving fungible goods is breached by the buyer, a seller could not recover a deficiency award under section 2–706 based upon a resale of goods other than those identified to the contract inasmuch as such a sale would not affect or alter the price received for the goods in either a private or public sale.

*Servbest*, 37 Ill.Dec. 945, 403 N.E.2d at 9. The Second Circuit adopted the *Servbest* rule in a case considering whether a heating oil seller could receive damages under § 2706 when the oil ultimately resold was different from the oil originally identified to the contract. *Apex Oil Co. v. Belcher Co. of New York, Inc.*, 855 F.2d 997, 1005 (2d Cir.1988). The resold model 1225 post-cure inflators remained reasonably identified to the contract. Thus Firwood is not barred from recovery simply because the PCIs it ultimately sold contained parts different than those at the time General Tire breached. The parts were fungible, and the PCIs into which they were placed were essentially the same PCIs specially made for General Tire.

However, *Apex Oil* and *Servbest* identified another important consideration for analyzing whether resales involving substituted fungible goods are commercially reasonable. In *Apex Oil*, the court noted that "[t]he most pertinent aspect of reasonableness with regard to identification and resale involves timing." *Apex Oil*, 855 F.2d at 1006. Noting that § 2706 is designed to provide the seller the difference between market value and the contract price, and that resale is designed to determine market price, the court cautioned

that timely resale was particularly important in cases involving substituted goods:

> The rule that a "resale should be made as soon as practicable after ... breach" should be stringently applied where, as here, the resold goods are not those originally identified to the contract. In such circumstances, of course, there is a significant risk that the seller, who may perhaps have already disposed of the original goods without suffering any loss, has identified new goods for resale in order to minimize the resale price and thus to maximize damages.

*Apex Oil,* 855 F.2d at 1007 (citation omitted); *see also McMillan v. Meuser Material & Equip. Co., Inc.,* 260 Ark. 422, 541 S.W.2d 911, 913 (1976) (finding resale commercially unreasonable because "the resale of [a] bulldozer, in excess of fourteen months after the alleged breach, will be of 'slight probative value' as an indication of the market price at the time of the breach.").

We must decide whether Firwood's resale of PCIs may not serve as the basis of the damage award because sales three years after a breach are not commercially reasonable. There is significant support for the view that three years is unreasonable. *See Apex Oil,* 855 F.2d at 1006–07 (finding that six-week delay between breach and resale of heating oil, when market volatility over that period was considered, prevented resale from accurately reflecting the market value of the oil); *Meuser Material,* 541 S.W.2d at 913.

■ Nevertheless, as the Second Circuit recognized in *Apex Oil,* sellers ought not to be precluded from recovering damages in every case in which resale does not occur immediately:

> "If no reasonable market existed at [the] time, no doubt a delay may be proper and a subsequent sale may furnish the best test, though confessedly not a perfectly exact one, of the seller's damages."

*Apex Oil,* 855 F.2d at 1006, *quoting* 4 Anderson on the Uniform Commercial Code § 2–706:25 (3d ed.1983). Indeed, Comment Five to Mich. Comp. Laws Ann. § 440.2706 (West 1994) notes that "[w]hat is such a

reasonable time depends upon the nature of the goods, the condition of the market and the other circumstances of the case; its length cannot be measured by any legal yardstick or divided into degrees." Even though there was a three-year delay between breach and resale here, we cannot say that the jury was required to find that the resale was commercially unreasonable. At the time of the breach, there was no market for PCIs, machines costing over thirty-thousand dollars that have a very specialized use. Moreover, Firwood made a continuing good faith effort to locate other purchasers. While a three-year delay is suboptimal, we are mindful that U.C.C. remedies are to be liberally construed to ensure that the aggrieved party is "put in as good a position as if the other party had fully performed...." Mich. Comp. Laws Ann. § 440.1106 (West 1994). Accordingly, we hold that the District Court did not err when it denied General Tire's motion for judgment as a matter of law.

**C**

■ Finally, defendant argues that the District Court erred in denying its remittitur motion to eliminate the interest portion of the damage award. Defendant argues that the District Court abused its discretion because, under the U.C.C., sellers are not entitled to interest damages when buyers breach the contract, and interest is a consequential, not incidental, damage. The District Court denied defendant's motion on the ground that, since courts have required breaching buyers to compensate sellers for extra interest payments made on loans as a result of a breach, plaintiff should be allowed to collect its lost use of money due to the breach. We review a district court's denial of a remittitur motion for abuse of discretion, reviewing the legal component of such denial *de novo.*

■ Resolution of this question rests on the distinction between incidental and consequential damages, for sellers are entitled to incidental, but not consequential damages, under the U.C.C.[1] Michigan defines a seller's incidental damages to include

1. *Compare* Mich. Comp. Laws Ann. § 440.2706(1) (West 1994) (seller's measure of

any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach.

Mich. Comp. Laws Ann. § 440.2710 (West 1994). The District Court held that "commercially reasonable charges ... resulting from the breach" include interest on the lost use of money caused by the breach. The District Court drew support for its expansive interpretation of "commercial reasonable charges" from *Bulk Oil (U.S.A.), Inc. v. Sun Oil Trading Co.,* 697 F.2d 481 (2d Cir.1983), in which the seller, Bulk Oil, was awarded post-breach interest payments on a loan taken out to finance its $4,000,000 fuel oil purchase. 697 F.2d at 482. The District Court implicitly held that lost use of money was "related to the concept of interest paid on a loan that would not have been taken out absent breach." Since interest payments constituted incidental damages under *Bulk Oil,* the District Court reasoned, Firwood could recover an analogous incidental damage, *viz.* its lost use of money caused by General Tire's breach.

*Bulk Oil* in turn drew support from *Neri v. Retail Marine Corp.,* 30 N.Y.2d 393, 334 N.Y.S.2d 165, 285 N.E.2d 311 (1972) and *Intermeat, Inc. v. American Poultry, Inc.,* 575 F.2d 1017 (2d Cir.1978) for its conclusion that incidental damages include interest payments attributable to the breach when the interest charges were foreseeable and commercially reasonable. *Bulk Oil,* 697 F.2d at 484.

In *Neri,* the New York Court of Appeals, without significant discussion, reversed a lower court ruling that had denied a boat dealer $674 in incidental expenses for "storage, upkeep, finance charges and insurance" on a boat. 334 N.Y.S.2d at 170, 285 N.E.2d at 315. In *Intermeat,* the Second Circuit cited *Neri* as support for its holding that a seller could seek "financing charges incurred incidental to the breach" when the buyer had wrongfully rejected a shipment of meat:

> The significance of the [*Neri*] decision for our purposes is that the Court of Appeals did not limit the scope of "incidental damages" to include only the activities enumerated in § 2–710 such as transportation, care and custody of the goods. It apparently gave a broad meaning to "reasonable charges, expenses or commissions incurred," reimbursement of which was necessary to make the plaintiff whole.

*Intermeat,* 575 F.2d at 1024.

■ Although New York has interpreted incidental damages broadly to include interest payments attributed to the breach under its version of the U.C.C.,[2] Michigan defines incidental damages much more narrowly. In *S.C. Gray, Inc. v. Ford Motor Co.,* 92 Mich. App. 789, 286 N.W.2d 34 (1979), the Michigan Court of Appeals held that a seller could not recover "interest it paid on loans taken out to maintain the business when Ford failed to pay" as incidental damages because interest payments constitute consequential damages. *S.C. Gray,* 286 N.W.2d at 43.

■ Moreover, Michigan courts have impliedly rejected sellers' claims to the lost use of money by treating interest payments as consequential damages. In *Sullivan Indus., Inc. v. Double Seal Glass Co., Inc.,* 192 Mich.App. 333, 480 N.W.2d 623 (1991), *ap-*

---

damages is difference between market price and unpaid contract price "together with any incidental damages") *with* Mich. Comp. Laws Ann. § 440.2713(1) (West 1994) (buyer's measure of damages is difference between market price and contract price "together with any incidental and consequential damages").

**2.** We also decline to follow the Second Circuit's embrace of an expansive definition of incidental damages because that Court appeared to conflate the definition of consequential damages with that of incidental damages. *Bulk Oil* held that the seller could recover post-breach interest pay-

ments because they "were commercially reasonable and *foreseeable* ...." 697 F.2d 481, 484 (2d Cir.1983). Foreseeability is an appropriate test for consequential damages. *See, e.g.,* Mich. Comp. Laws Ann. § 440.2715(2) (West 1994) (defining buyers' consequential damages to include "any loss ... which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise"). Buyers and sellers seeking incidental damages need not prove that such charges were foreseeable; they merely must show that they were commercially reasonable.

*peal denied,* 441 Mich. 931, 498 N.W.2d 737 (1993), the Court of Appeals noted: "Examples of consequential damages include lost profits and interest paid on loans taken out to maintain business operations, see *S.C. Gray,* 92 Mich.App. at 811–812, 286 N.W.2d 34." *Sullivan Indus.,* 480 N.W.2d at 631 (citations omitted); *see also id.* 480 N.W.2d at 633 ("Interest paid on loans taken out to maintain the business, if foreseeable, falls within the category of consequential damages as prescribed by the UCC."). Since Michigan considers interest paid on loans to be a consequential damage, not an incidental damage, and since sellers may not seek consequential damages, Firwood could not have sought to collect interest payments on a loan to pay for the raw materials in the machines it was to build for General Tire. Nor could it seek the economic equivalent—its lost use of money. The District Court sought to limit the scope of *S.C. Gray* and *Sullivan Indus.* by noting that they involved claims for interest plaintiff paid on loans to maintain the business when defendant breached rather than for lost use of money caused by the breach. Quoting language from *Petroleo Brasileiro, S.A., Petrobras v. Ameropan Oil Corp.,* 372 F.Supp. 503, 508 (E.D.N.Y. 1974)—"[C]onsequential damages do not arise with the scope of the immediate buyer-seller transaction, but rather stem from losses incurred by the non-breaching party in its dealings, often with third parties . . . ."—the Court held that "interest paid on a loan taken out due to the lost use of funds clearly does not arise within the scope of the immediate buyer-seller transaction, [but] the actual loss of the use of the funds does arise in that transaction."

We do not believe *S.C. Gray* or *Sullivan Indus.* can be distinguished in the manner suggested by the District Court. The District Court provided no explanation for why one transaction arises within the scope of the buyer-seller transaction and the other does not, and we do not believe such a distinction exists. Granted, a seller's payment of interest payments brings a third party—most likely a banker—into play; this third party relationship might seem to take the payments outside "the scope of the immediate buyer-seller transaction." But a seller's lost use of funds also depends on the existence of third parties, *viz.* banks or other institutions willing to pay the seller interest. We do not believe a distinction based upon the presence of third parties can be made between these two situations.

Moreover, even if lost use of money were somehow economically distinguishable from interest payments on a loan, we are inclined to agree with the Seventh Circuit's view that sellers are not entitled to the former as an element of the damage award because lost use of funds is a consequential damage. In *Afram Export Corp. v. Metallurgiki Halyps, S.A.,* the Seventh Circuit rejected a seller's claim for interest payments. 772 F.2d 1358 (7th Cir.1985). Noting that

a foregone profit from exploiting a valuable opportunity that the breach of contract denied to the victim of the breach fits more comfortably under the heading of consequential damages than of incidental damages

it held that "the interest or profit [plaintiff] could have obtained from investing, or using elsewhere in its business, the money that it would have gotten [if defendant had not breached]" was a consequential damage. *Afram Export,* 772 F.2d at 1369–70. Since sellers may receive only incidental damages, not consequential damages, and since the lost use of money is a consequential damage, Firwood was not entitled to receive interest as a measure of the damage award.

Firwood offers two arguments in support of the District Court's denial of General Tire's remittitur motion. First it cites *Commonwealth Edison Co. v. Decker Coal Co.,* 653 F.Supp. 841 (N.D.Ill.1987), which holds:

In an action for the price, the seller is entitled to its damages from its loss of the use of the money it would have had if the buyer had paid on time—i.e., some level of prejudgment interest—as incidental damages resulting from the breach. §§ 2–709(1), 2–710; *Bulk Oil (U.S.A.) Inc. v. Sun Oil Trading Co.,* 697 F.2d 481, 484–485 (2d Cir.1983); *Klockner, Inc. v. Federal Wire Mill Corp.,* 663 F.2d 1370, 1380 (7th Cir.1981).

*Commonwealth Edison,* 653 F.Supp. at 845. We decline to follow the holding of *Commonwealth Edison* for two reasons. First, its holding that lost use of funds constitutes incidental damages conflicts with *Afram Export,* which was decided by the Circuit Court in which the Northern District of Illinois sits. *See Afram Export,* 772 F.2d at 1370 (noting that "a foregone profit ... fits more comfortably under the heading of consequential damages than of incidental damages."). Second, neither of the cases cited in *Commonwealth Edison* stands for the proposition that sellers are entitled to the lost use of money as incidental damages. After discussing whether extra interest payments on a loan constitute incidental damages from a breach, the pages cited in *Bulk Oil,* 697 F.2d at 484–85, discuss the availability of *statutory* interest, not whether the seller's lost interest income constitutes an incidental damage. Similarly, *Klockner, Inc.* involved an award under Illinois's statutory interest provision, Ill.Rev. Stat. ch. 74, § 2, (now codified at Il. St. Ch. 17 ¶ 2); it does not hold that sellers may receive lost interest income as a measure of incidental damages. *See* 663 F.2d at 1380.

■ Firwood next argues that the U.C.C. allows courts to consider the common law to evaluate the propriety of the jury's award of interest as an element of incidental damages; such an analysis of Michigan common law, Firwood argues, sanctions awards of interest to compensate the lost use of money as a result of a breach. Michigan's U.C.C. provides that

> [u]nless displaced by the particular provisions of this act, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions.

Mich. Comp. Laws. Ann. § 440.1103 (West 1994). The District Court may be read to have accepted Firwood's argument:

> Firwood further relies on § 1–103 of the U.C.C. That provision reads "Unless displaced by the particular provisions of this act, the principles of law and equity ... shall supplement its provisions." M.C.L.

§ 440.1103. To some extent, the pre-existing common law principles may serve to supplement the definitions of consequential and incidental damages in the code. To that extent, the common law of Michigan supports our conclusion here.

The applicability of § 440.1103 here depends upon whether interest is incidental or consequential. Since we have found that it is consequential, allowing a seller to receive interest for the lost use of money would appear to *contradict,* not supplement, Mich. Comp. Laws. Ann. § 440.2706 (West1994), which allows sellers to recover incidental, but not consequential, damages, and Mich. Comp. Laws Ann. § 440.2710 (West 1994), which defines a seller's incidental damages. As the District Court recognized, Michigan common law would be relevant only to the extent it supplemented the definition of incidental damages found in § 440.2710, for it cannot "supplement" the types of damages available to sellers under § 440.2706. Michigan common law provides no such supplemental understanding of incidental damages, and the two cases offered by Firwood—*Gordon Sel–Way, Inc. v. Spence Bros., Inc.,* 438 Mich. 488, 475 N.W.2d 704 (1991) and *Sullivan Indus., Inc. v. Double Seal Glass Co., Inc.,* 192 Mich.App. 333, 480 N.W.2d 623 (1992), *appeal denied,* 441 Mich. 931, 498 N.W.2d 737 (1993)—are not on point. Although noting that "Michigan has long recognized the common-law doctrine of awarding interest as an element of damages," 475 N.W.2d at 711, *Gordon Sel–Way* sheds no light on the definition of incidental damages found in § 440.2710. Nor does *Sullivan Industries.* Thus, we do not find Michigan's common law to suggest a result different from that reached above, *viz.* that sellers are not entitled to compensation for the loss of use of funds as an element of incidental damages.

■ Nevertheless, Firwood was entitled to claim statutory interest from the date on which suit was filed under Mich. Comp. Laws Ann. § 600.6013 even if, as a seller, it was not entitled to interest as a measure of damages under the U.C.C. *Cf. Banish v. City of Hamtramck,* 9 Mich.App. 381, 157 N.W.2d 445 (1968) (considering "the question of pre-

judgment interest, *i.e.*, interest allowed as damages, as distinguished from statutory interest."); *Militzer v. Kal–Die Casting Corp.*, 41 Mich.App. 492, 200 N.W.2d 323, 326 (1972) ("Defendant fails to distinguish between judgment interest [under Mich. Comp. Laws Ann. § 600.6013] and prejudgment interest. The former is statutory and mandatory, the latter an element of damages and discretionary.").

### III

For the foregoing reasons, the District Court is **AFFIRMED** in all respects except: the award of interest as an element of damages is **VACATED**, and the case is **REMANDED** to the District Court for calculation of prejudgment interest under Mich. Comp. Laws Ann. § 600.6013.

WELLFORD, Circuit Judge, concurring in part and dissenting in part.

I concur with Judge Kennedy's decision on the issue of General Tire's liability for breach of contract. I write separately, however, on the question of interest.

I read the case relied upon by Judge Kennedy, *Afram Export Corp. v. Metallurgiki Halyps*, 772 F.2d 1358 (7th Cir.1985), in a somewhat different fashion than does she. *Afram* states, among other things, in dealing with a claim for interest by a seller claiming beach and loss of the bargain or profit:

> The next issue relates to incidental damages, which the Uniform Commercial Code allows a seller who is the victim of a breach of contract to recover in addition to the difference between sale price and cover price. U.C.C. § 2–706(1), Wis.Stat. § 402–706(1). [Afram] can recover [ ] interest, if at all, only as incidental damages, and not as consequential damages, for under the Uniform Commercial Code consequential damages are a buyer's, not a seller's, remedy.
>
> The line between incidental and consequential damages is rather unclear.
>
> . . .

The actual case is somewhere in the middle, but if we had to decide exactly where, we probably would disagree with the district judge, who regarded this as a case of consequential rather than incidental damages. Although knowledge of the details of the seller's financial arrangements is not chargeable to the buyer, it is obvious to the buyer and unavoidable by the seller that the *seller will incur an interest cost (explicit or implicit, as we shall see) in the interval between the breach of the contract and the cover sale;* and the party who is better able to avoid this expense and who therefore should bear the risk of its occurrence isthe contract-breaking buyer, not the seller. The cases therefore allow the seller to recover the additional interest expense as incidental damages. See, e.g., *Bulk Oil (U.S.A.), Inc. v. Sun Oil Trading Co.*, 697 F.2d 481, 482–84 (2d Cir.1983); *Hofmann v. Stoller*, 320 N.W.2d 786, 792–93 (N.D.1982); *Gray v. West*, 608 S.W.2d 771, 781 (Tex.Civ.App. 1980).

*Id.* at 1368, 1369 (emphasis added). The *Afram* court would, therefore, allow "additional interest expense," as *incidental* damages.[1] *Id.* at 1369. Afram was "not really complaining about an extra interest expense, it is complaining about losing the use of part of the money it borrowed from the bank." *Id.* The "extra" claimed by Afram was interest it had to pay "on a general business loan not tied to the subject matter of the sale." *Id.* at 1370. *Afram* concludes that "[a]ll the seller is entitled to is an out-of-pocket interest expense that would not have been incurred but for the breach." *Id.*

Afram was entitled, in any event, under Wisconsin law, to statutory interest "from the date of breach to the date of judgment," since the damages were "ascertainable by reference to an objective standard of value." *Id.* at 1371. The case was remanded for a determination of prejudgment interest at the statutory rate. *Id.* at 1372. In reality, the statutory prejudgment interest allowance

---

**1.** *Afram* cited *Bulk Oil (U.S.A.), Inc. v. Sun Oil Trading Co.*, 697 F.2d 481 (2d Cir.1983), with approval for the proposition that the seller might recover "additional interest expense as incidental damages." *Id.* at 1369.

subsumed the "extra" or "out-of-pocket interest expense" which Afram may have claimed.

In my view, *Afram* is not inconsistent with the holding in *Commonwealth Edison Co. v. Decker Coal Co.,* 653 F.Supp. 841 (N.D.Ill. 1987), that a seller might recover "some level of prejudgment interest as incidental damages resulting from the breach." *Id.* at 845. *Commonwealth Edison* cited with approval *Bulk Oil (U.S.A.), Inc. v. Sun Oil Trading Co.,* 697 F.2d 481 (2d Cir.1983), which supports that proposition.

*Bulk Oil* held that New York statutory interest was allowable ("compensation for the use of money") to make the aggrieved seller "whole." 697 F.2d at 485. Interest incurred to the bank directly attributable to the contract breached by the buyer was permissible under the U.C.C. just as "any other expense cognizable as incidental damages." *Id. Bulk Oil* noted *Petroleo Brasileiro v. Ameropan Oil Corp.,* 372 F.Supp. 503 (E.D.N.Y.1974), as relevant to its holding. *Id.* at 484. *See Ernst Steel Corp. v. Horn Construction Div.,* 104 A.D.2d 55, 481 N.Y.S.2d 833, 839 (1984) ("in an appropriate case a seller is entitled to recover commercially reasonable finance and interest charges incurred as a result of buyer's breach as a proper item of incidental damages"); *see also Intermeat, Inc. v. American Poultry, Inc.,* 575 F.2d 1017, 1024 (2d Cir.1978) (" 'incidental expenses' in the U.C.C. [to the seller under New York law] include financing charges incurred incidental to the breach, as distinguished from consequential damages").

Turning to Michigan law, Judge Kennedy discusses two Michigan Court of Appeals decisions, *Sullivan Industries, Inc. v. Double Seal Glass Co., Inc.,* 192 Mich.App. 333, 480 N.W.2d 623 (1991), *appeal denied,* 441 Mich. 931, 498 N.W.2d 737 (1993), and *S.C. Gray, Inc. v. Ford Motor Co.,* 92 Mich.App. 789, 286 N.W.2d 34 (1979). The latter case held that interest paid on borrowed capital constituted consequential damages, citing *Petroleo Brasileiro,* which was decided under New York law and within the Second Circuit. That court did not consider statutory interest. *Sullivan Industries* held that "generally interest incurred and paid by a plaintiff as a result of additional borrowings made neces-

sary by a defendant's breach of a contract is recoverable in Michigan, *in addition to prejudgment interest.*" 480 N.W.2d at 633 (emphasis added). In light of that language, this writer is not convinced that some element of "incurred" or additional interest may not be allowable.

I agree with the majority, however, that, in any event, statutory interest may be allowable and should be calculated for Firwood's benefit. In addition, however, I would REMAND the additional interest question for the district court to determine whether plaintiff has demonstrated a right to any interest "incurred and paid" by it, or any incidental interest or finance charge which might be allowable under the U.C.C. in Michigan. Plaintiff would not, of course, be entitled during the same period to both incidental interest and statutory interest. I would add that such a question is essentially a matter of law and may not be a jury determination.